JOHN H. GOSSLER & others *vs.* EAGLE SUGAR REFINERY.

One who agreed to sell " Manila sugar " to refiners, and delivered to them what is usually called in commerce by that name, can, in the absence of fraud, misrepresentation or warranty, recover the agreed price, though the article delivered contained more impurities than sugar known under that name usually does.

At the trial of an action for the price of Manila sugar sold and delivered, it was admitted that the article delivered contained four per cent. of sand. A witness who had testified that he had no knowledge of refining, but was agent for a sugar refinery, and had bought sugar for it, was allowed, against the defendants' objection, to testify that a lot he had bought contained three per cent. of sand and was superior Manila sugar; and on cross-examination he testified that he did not test this lot, but that it was reported to him. The question submitted to the jury was, whether the four per cent. of sand was such an adulteration as to prevent the article delivered from being called in commerce Manila sugar. *Held*, that allowing the witness to testify as an expert was not a good ground of exception.

CONTRACT on an account annexed for Manila sugar sold by the plaintiffs to the defendants. Trial, and verdict for the plaintiffs, in the superior court, before *Brigham*, C. J., who allowed the following bill of exceptions:

" There was evidence tending to prove that the sale of the sugar in dispute was made through a broker, and the sale note was as follows : ' Boston, May 12, 1868. Sold to Eagle Sugar Refinery, for account of Messrs. Gossler & Co., 3400 bags Manila sugar. Ex Medena. @ $10\frac{7}{8}$ less $2\frac{1}{3}$ cash. Duty to be at rate of $39\frac{1}{2}$ % premium. Jos. B. Glover & Co., Merchandise Brokers ; ' that after the delivery of the sugar, and in the process of refining, it was found to contain four per cent. of sand ; that the defendants and the brokers were notified thereof ; and that at the time of the sale neither buyer nor seller knew of the existence of sand proper in the sugar. The plaintiffs submitted evidence tending to show that four per cent. of sand in sugar of that grade was not an unusual quantity ; and the defendants submitted evidence tending to show that of sand proper there was none, that four per cent. would be an unusual quantity, and that the lot in question contained three per cent. more than was usual in sugar of this description.

" In the examination, as a witness, of Samuel T. Lamb, the agent of the defendants, he was asked ' if he did not figure with a certain degree of nicety in fixing the price of sugar by its quality,' which, being objected to, the judge refused to allow the question to be put, and the defendants excepted.

" The plaintiffs called Warren Fisher as an expert, who testified that he was agent of the Adams Sugar Refinery ; that he had no knowledge of refining, but bought for the company ; and that he bought in 1866 one lot of 19,000 bags of Manila sugar. The defendants objected to the witness testifying as an expert. The judge allowed him to so testify, and he stated that said lot contained three per cent. of sand, and that it was superior Manila sugar. On cross-examination, he testified that he did not test the sugar referred to ; and that it was reported to him. There was no evidence offered to show any custom among merchants to consider Manila sugar containing four per cent. of sand merchantable sugar or Manila sugar in the market, and the examination of the witnesses was confined to the question whether this lot of sugar contained more than the usual quantity of sand in Manila sugar of that grade.

" The defendants requested the judge to instruct the jury as follows : ' The sale being of Manila sugar, it is for the jury to find whether there was four per cent. of sand in the goods delivered, and, if they find there was, then the verdict should be for the defendants. If the jury are satisfied that the sugar delivered contained an amount of sand unusual in Manila sugar, then the defendants will be entitled to a verdict, or a deduction from the bill to the amount of the price charged for the weight of sand. If the jury are satisfied that the sugar delivered contained an amount of sand unusual in Manila sugar, then the defendants are entitled to a deduction from the bill of the price charged for the weight of sand in excess of the amount shown to have been usually found in such sugar.'

" 'The judge declined so to instruct the jury, and charged them substantially that the question for them to decide was, simply, whether the sugar delivered answered the description in the sale note in being sugar; that the four per cent. of sand was not in dispute; that the question for them was, whether the four per cent. was such an adulteration as prevented it being called in commerce Manila sugar; that, if it was sugar, the plaintiff could recover; that the existence of the four per cent. of sand was not a decisive circumstance for the defendants in any event; that the defendants complained that they did not get what they bought; and that, if what they got was an article which, in commercial language, passed for sugar, the plaintiffs could recover; and he instructed them to answer the following question : ' Did the plaintiffs deliver to the defendants an article which in commercial language might properly be said to come under the denomination of Manila sugar ? ' The jury answered in the affirmative, and the defendants alleged exceptions."

*A. Cottrell*, for the defendants.

*E. D. Sohier*, for the plaintiffs.

AMES, J. The only approach to a warranty in the sale to the defendants is to be found in the descriptive words " Manila sugar," contained in the bill of sale. Upon this point the jury were correctly instructed that, in deciding whether the article

actually delivered corresponded to that description, they were simply to make up their minds whether it was such sugar as is usually known in commerce. under that name. Was it an article which in commercial language passes for, and is properly and usually known as, Manila sugar? This question the jury have answered in the affirmative, and it therefore must be considered as an established fact that the defendants received what they undertook to buy, or, in the language of the court, they have got what they bought.

It appears that they bought the sugar for the purpose of refining it. They must be considered as having expected to find in it more or less of impurity. Their complaint is, that it has proved more impure than they expected to find it, and more so than sugar known under that descriptive name usually is, but they neither asked nor received any warranty as to its quality or purity, and they do not impute to the plaintiffs any fraud, or charge them with having made any representation except what appears on the face of the bill of sale, or with having had any knowledge as to the purity of the sugar that they did not communicate. They do not claim that they bought by sample, or that they were prevented from examining the property, or that it was not merchantable Manila sugar, or that they ever offered to return it. If they had doubts about the goodness of the article, or did not choose to run the risk of latent defects, they should have refused to purchase without a warranty upon these points. If the plaintiffs sold it as Manila sugar, in good faith and believing it to be so, without any warranty of its quality or purity, and if it actually was Manila sugar, as that term is understood in commerce, it is difficult to see why they are not entitled to be paid. The defendants made up their mind what they would give, and bought entirely on their own judgment. In the absence of warranty, or deceit or misrepresentation of any kind, on the part of the plaintiffs, it is difficult to see any ground on which the defendants can be relieved from their con tract.

The question addressed to the witness Lamb was unimpor tant and immaterial, and properly excluded. In regard to the

witness examined as an expert, the question whether he should have been received as such was for the presiding judge to pass upon; and usually that question is left to his discretion. His decision upon it is not a matter of exception, unless a report of the entire evidence upon the point presents a question of law. *Quinsigamond Bank* v. *Hobbs,* 11 Gray, 250. *Bierce* v. *Stocking,* Ib. 174. *Shattuck* v. *Stoneham Branch Railroad,* 6 Allen, 115. The case does not disclose any sufficient reason for overruling the decision of the presiding judge upon this point. The cross-examination appears to have brought out a material qualification of what he stated in chief, as to the transaction which he described, but it does not appear that any ruling was asked for in relation to that testimony as given, or that its admission was injurious to the defendants in its bearing upon the question actually submitted to the jury by the court.

A majority of the court concur in the decision that the entry must be *Exceptions overruled.*