## MATHIEU v. GEORGE A. MOORE & CO.

(District Court, N. D. California, Second Division. February 13, 1925.)

### No. 16643.

1. **Sales** ⬅166(1)—Shipment of sugar held to comply with contract.

A contract for sale of "native brown sugar," to be shipped from Saigon, Indo-China, *held* fulfilled by the seller by the shipment of sugar of the kind ordinarily shipped from that port and of fair average quality.

2. **Sales** ⬅166(2)—"Merchantable" to be defined in light of subject-matter of contract.

"Merchantable" is a relative term, to be defined in the light of the subject-matter of the contract, and the fact that sugar delivered under a contract, shipped from an Asiatic port, was not of a kind salable to the buyer's customers, or in its market, did not authorize its rejection, where it was the kind specified in the

contract, and merchantable for the purposes for which such sugar is used.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Merchantable.]

**3. Sales ⚖=83—Seller held not obligated to supply shipping.**

A contract for sale of sugar to be delivered f. o. b. ship at an Asiatic port *held* not to require the seller to supply the vessel; it appearing from correspondence that such was not the understanding of the parties.

**4. Sales ⚖=170—Delay in shipment held not to justify rejection by buyer.**

Delay in shipment of a second cargo of sugar under a contract for lack of transportation, not due to fault of the seller, who had the sugar ready for shipment, *held* not to justify its rejection by the buyer.

At Law. Action by Edgar Mathieu against George A. Moore & Co., a corporation. Judgment for plaintiff.

P. A. Bergerot and A. P. Dessouslavy, both of San Francisco, Cal., for plaintiff.

Ira S. Lillick, of San Francisco, Cal., for defendant.

PARTRIDGE, District Judge. This is an action for breach of contract to accept and pay for 200 tons of Indo-Chinese sugar, and also for the sum of 15,000 piastres ($19,500), money expended by plaintiff for defendant's account. The defendant has filed a cross-complaint, seeking to recover $75,000 damages for the breach of another sugar contract, and for $1,456.33 money advanced. The contract upon which the suit was brought consisted of certain cablegrams between the plaintiff in Saigon and the defendant in San Francisco. Those cables refer to the subject-matter as "sucre indigene brun," the meaning of which was the subject of much controversy at the trial; plaintiff contending that the words meant the rough brown sugar produced ordinarily in Indo-China, and defendant insisting that it meant the kind of sugar shown by certain samples alleged to have been exhibited to it.

Previous to April 24, 1920, there had been certain negotiations with regard to Indo-Chinese trade, through the medium of one Schroder, and which will be referred to hereafter. But on April 24th plaintiff sent a cable in cipher to defendant, with reference to these preceding transactions, and ending with these words: "Should you wish to buy sugar in the future, kindly give instructions on new basis." On April 28th plaintiff again cabled defendant: "Re-

sponse votre cable vingtdeux Aril, confirme mon precedent due vingtquatre Marche actuel sucre bausse considerable dernieres transactions avec Chine sur base troiscents piastres tonne sucre indigene brun pourrais actuellement vous assurer deuxcents tonnes en double sac prix deuxcentvingt piastres fob Saigon. Si acceptez cablez fonds."

The cable from defendant referred to was one of April 27th, in cipher, ending thus: "What can you offer sugar, quantity, date of shipment, loading port? Quote price f. o. b. shipping points. Can you arrange tonnage, or shall we arrange?" On May 3d plaintiff cabled: "Sugar 200 tons, double bags, shipment May-June f. o. b. Saigon, 220 local currency per ton. Loading here. Am trying hard to supply tonnage. Can supply large quantity sugar shipment June-July at the rate of 220–260 local currency at the end of crop."

On May 3d, defendant answered: "Replying to your 200 tons brown native sugar, we accept at 220 piastres per ton f. o. b. Saigon. We have opened credit by cable Chartered Bank for $50,000. When can you ship? Confirm this. Make further offer." May 17th, the plaintiff confirmed, as follows: "I confirm order for 200 tons. Letter of credit transferred to the Chartered Bank by cable. Does not state name of bankers through whom credit is opened. Please remedy immediately, and cable. Urgent. Probably can supply next month or earlier 200 tons more about at the same conditions 220 to 260. Open new credit 50,000 gold dollars. Do utmost to obtain 1,000 tons additional in Annam at the same prices. If you could give me more liberal credit permitting advances, as the purchases must be paid in cash in Annam and forwarded here for shipment. To facilitate, willing to endeavor secure freight and insurance your risk."

On May 31st plaintiff shipped 115.05 long tons on the steamer Santa Cruz, arriving in San Francisco on June 29th, and on July 28th shipped 63.67 long tons, arriving here per the West Niger on September 24th. On July 19th defendant cabled plaintiff: "We reject shipment account quality and single bags. Cannot accept further shipment." On the trial, however, it was admitted that the sugar was in double bags; so that, so far as this phase of the case is concerned, the defense is one of quality only.

The first question, therefore, is the subject-matter of the contract. It was for "sucre indigene brun"; that is, "native

brown sugar." The defendant claims that these words had a meaning defined and limited by certain samples exhibited by one Schroder in San Francisco. It is, of course, elementary that there must be a meeting of minds upon this subject, as well as any other part of the contract. It would not be sufficient that defendant, when he contracted for "native brown sugar," had in mind the sugar indicated by the samples shown him by Schroder, unless the plaintiff also knew that that was the intent. In other words, there must be a showing that Schroder acted for plaintiff in exhibiting samples to defendant, and that both parties understood that, when the phrase "native brown sugar" was used, it meant sugar of the kind indicated by the samples.

Schroder, however, left San Francisco fully five months before this contract was made. There is no real evidence that he acted for plaintiff in any way; and, indeed, defendant cabled to plaintiff: "New business on account do not know quality. Cannot buy more until you send sample." The record, and the correspondence are full of expressions by defendant showing that it had really contracted for a quality of sugar of which it had no knowledge whatsoever. The record, also, is full of evidence to the effect that the year 1920 was a time of frenzied speculation in sugar (as well as other commodities), and that there was a mad scramble for sugar everywhere.

It is, of course, a fact that toward the end of that year there was the greatest fall in the prices of staples in the history of civilization. And on the whole I cannot avoid the conclusion that this contract, on the part of the defendant was a mere "leap in the dark"—or at least, if they relied upon the samples shown by Mr. Schroder, they did so without the knowledge of the plaintiff. And not only does the state of the sugar markets of the world in 1920 bear out this conclusion. The price of the goods in this contract shows clearly that it was for an extremely low grade of sugar. Defendant wrote plaintiff on July 29th: "On sampling the sugar, we were very much surprised to find such extremely poor quality, which could not in any way be classified as fair average. In the one shipment, there were three different lots: No. 1, polarizing 77.8; No. 2, 72.1; and the mixed, 74.5 or an average of 75⅜, which is lower than the poorest Philippine sugar, known as Muscavados, ever received here, polarizing about 82 or 83 degrees."

But the price of Philippine "muscavados" in New York in May was 16½ to 19½ cents c. i. f. The contract price between plaintiff and defendant, c. i. f. San Francisco, was less than 10 cents a pound. It could scarcely be said, therefore, that the contract was for anything except an exceedingly low grade of sugar.

The evidence shows that the natives in Indo-China produce the cane on small plantations. They have crude crushing plants, operated by cattle, for crushing the cane. The juice is then boiled and run into large molds, where it hardens into cakes. One witness, a young man whose father was in business in Saigon, testified that, after this sugar was gathered up by the "compradors," it was again boiled in Saigon and other centers, and a certain amount of the impurities removed. This witness said that he saw the sugar which arrived here on the Santa Cruz, and it was "first run" sugar. The validity of his judgment on this point, however, is seriously affected by the fact that this sugar was in small cakes, tending at least to show that it had been subjected to the second process.

Moreover, a sample taken by defendant, and produced by it in court, appeared to the witness to be "second run," and was in fact quite clean. In any event, the evidence of those who saw the sugar in Saigon before shipment is quite conclusive to the effect that it was f. a. q. of the season, and of the kind ordinarily exported from Indo-China. The United States Bureau of Foreign and Domestic Commerce, moreover, reports as follows: "After the syrup is allowed to stand for several days, it produces a dark brown sirupy mass, called by the natives 'duong-whut-mia.' * * * This is the principal product, and makes up almost the entire bulk of foreign export."

[1] It is, of course, well settled that a contract of this kind is satisfied by a delivery of goods of the kind ordinarily shipped from the port of origin. Thus, in Jones v. Clarke, 2 H. & N. 725, 27 L. J. Exch. 165, a contract for "pitch pine timber," ex ship from Savannah, was held satisfied by the ordinary lumber shipped from that port, although better timber came from other parts of the Americas. In Beck v. Sheldon, 48 N. Y. 365, where the contract was for "Poughkeepsie foundry pig iron," it was held that the actual quality of the goods, in comparison with iron from other foundries, was immaterial, provided the iron was fair average quality of that particular foundry. In Gossler v. Eagle Sugar Refinery, 103

Mass. 331, where the sales note called for "Manila Sugar," it is said:

"If they had doubts about the goodness of the article, or did not choose to run the risk of latent defects, they should have refused to purchase without a warranty upon these points. If the plaintiffs sold it as Manila sugar, in good faith and believing it to be so, without any warranty of its quality or purity, and if it actually was Manila sugar, as that term is understood in commerce, it is difficult to see why they are not entitled to be paid. The defendants made up their mind what they would give, and bought entirely on their own judgment. In the absence of warranty, or deceit or misrepresentation of any kind, on the part of the plaintiffs, it is difficult to see any ground on which the defendants can be relieved from their contract."

In Mechem on Sales, § 1340, it is said:

"This rule clearly does not require the best goods in the market, nor necessarily the second best; but it is equally clear that it will not be satisfied by a delivery of the worst. A more precise statement is not possible. Each case must be governed by its own facts and circumstances, and in the light of these it must be determined whether the goods supplied are of at least medium quality and goodness. More than that is not required; less than that will not suffice."

Applying these tests, and taking the evidence as a whole, I am satisfied: (1) That the sugar supplied was the *kind* called for by the contract; (2) that it was a fair average *quality* of that *kind*.

[2] Defendant contends, however, that even a delivery of a fair average quality of sugar of the kind specified in the contract would not suffice, but that, in addition, the goods must be merchantable. That is, of course, true, where the goods are at a remote point, and inaccessible to the buyer. But merchantable is a relative term. It must in all cases be defined in the light of the subject-matter of the contract. Of course, this sugar could not be sold to those who demanded white sugar, nor, perhaps, even to refiners. But the evidence is satisfactory to the point that it was merchantable to those who want the very kind of sugar called for by the contract. If it could not be sold in this market, that is no fault of the seller. It arrived upon a glutted and falling market, and it was contracted for at a time when American buyers were feverishly contending with one another for any kind of sugar.

The next question raised by defendant is as to the time of shipment. On June 4th plaintiff cabled: "Have shipped about 130 tons per steamer Santa Cruz left here on 31st May; second shipment next vessel end of month." This shipment arrived June 29th. On July 2d defendant cabled that it could not accept shipment after June. On July 19th defendant cabled, rejecting the sugar, and notifying plaintiff that it would accept no more. On the part of defendant it is contended that its contract was entire, and that the shipment of a part was no compliance with it, and that it was incumbent on plaintiff to furnish the vessel. Plaintiff, on the other hand, insists that he was under no obligation to furnish transportation; that he had the whole 200 tons ready to ship, and that his failure so to do was not his fault; and that, in any event, defendant is bound to pay for the Santa Cruz shipment.

[3] On the question as to who is under obligation to supply shipping when the contract is f. o. b., the authorities seem to be conflicting. I say "seem to be," for close examination discloses that the conflict is more apparent than real, and depends upon the specific facts of each case. In a note to 23 R. C. L. 1337, it is said that "the better view" is that this duty devolves upon the seller. But an examination of the cases shows that this statement is not only much too broad, but is not even justified by the recent cases. The view in England is just the contrary. See Armitage v. Insole, 14 Q. B. 728; Sutherland v. Allhusen, 14 L. T. 666; Brandt & Co. v. Morris & Co., [1917] 2 K. B. 784. So in this country: Evanston Elevator & Coal Co. v. Castner (C. C.) 133 F. 409; Baltimore & L. Ry. Co. v. Steel Rail Supply Co., 123 F. 655, 59 C. C. A. 419.

In U. S. Smelting Co. v. American Galvanizing Co. (D. C.) 236 F. 596, it is said: "A contract to deliver f. o. b. vessel at the port of departure would be held to mean that the shipper is to be at the expense of loading. It just as clearly would not be said to mean that he had the right to select or was bound to supply the vessel." But, after all, each case must stand on its own facts. Here the cablegrams in effect made it clear that there was no such duty upon the plaintiff. Defendant wired: "Can you arrange tonnage, or shall we arrange?" To which plaintiff replied: "To facilitate, willing to endeavor to secure freight and insurance your risk."

[4] In addition to that, I am satisfied

from the evidence that plaintiff had the sugar ready to ship, and that the delay was due solely to the lack of bottoms at Saigon, and furthermore that the delay in shipping the second cargo had nothing whatever to do with the rejection. On the contrary, the evidence fairly justifies the conclusion that defendant contracted for an article not readily salable in this market, and that the rejection was due to the discovery of this fact, coupled with a falling market.

The complaint also seeks the recovery of 15,000 piastres expended by plaintiff for defendant's account. In December, 1919, two men, Dickson and Schröder, were about to leave San Francisco for the Orient in connection with the purchase of sugar. They went to one Giraud, the commercial representative here of Indo-China, and induced him to send the following cable: "Vu Schroder, qui part aujourdhui par Nanking avec agent Americaine pour conclusion affaire; possede lettre credit un million trois cent mille dollars ou demande imperativement vous assurer tout sucre possible Saigon environs." Mr. Dickson, it is clear from the evidence, was the agent referred to, and he had letters of credit from defendant in the sum named. The defendant saw Mr. Giraud, and instructed him to confirm this cable, whereupon Giraud wired that Dickson had departed "a pleins pouvoirs." Relying upon this, plaintiff secured options upon a large amount of sugar, upon which he laid out 15,000 piastres. After his arrival in the Orient, Dickson died (or was murdered), and plaintiff found himself without funds to take up the options. The subsequent correspondence is conclusive to the fact that the defendant recognized that the money had been expended for it, and that it was obligated to repay it.

What has been said in the last paragraph disposes of the cross-complaint.

The judgment will therefore be for the plaintiff for $47,541.88, with interest and costs.