**RHONE–POULENC INCORPORATED, Plaintiff–Appellant,**

v.

**INTERNATIONAL INSURANCE COMPANY and International Surplus Lines Insurance Company, Defendants–Appellees.**

Nos. 95–1294, 95–1525.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 1995.

Decided Dec. 11, 1995.

Rehearing Denied Jan. 17, 1996.

Eugene A. Schoon, Gerald L. Angst, Mary H. Lindsay, Sidley & Austin, Chicago, IL, Marc S. Mayerson (argued), Thomas W. Mitchell, Herbert Dym, Sonya D. Winner, Covington & Burling, Washington, DC, Luke W. Mette, Zeneca, Inc., Environmental Law Dept., Wilmington, DE, for plaintiff-appellant.

Aaron J. Kramer, Joseph R. Lundy, Jill B. Berkeley, Schiff, Hardin & Waite, Chicago, IL, Sandra Young, Howard J. Fishman, Purcell & Wardrope, Chicago, IL, Karl D. Belgum (argued), Gary L. Fontana, Christine C. Franklin, Thelen, Marrin, Johnson & Bridges, Los Angeles, CA, for defendants-appellees.

Before POSNER, Chief Judge, and COFFEY and FLAUM, Circuit Judges.

POSNER, Chief Judge.

The appeal from the dismissal of this diversity breach of contract suit presents an interesting and, we suspect, important question, nominally of Illinois law, concerning the

characterization of an insurance policy as "primary" or "excess." A policy is primary if the insured has a right to collect the proceeds in the event of a loss regardless of what other insurance he may have. It is excess if his right is contingent on his having exhausted the limits of his other insurance. There are also hybrid primary/excess policies, which the insurance company calls "excess by coincidence" policies and which it argues the policies at issue in this case are. There may be other types of hybrid primary/excess policies as well, see Michael M. Marick, "Excess Insurance: An Overview of General Principles and Current Issues," 24 *Tort & Ins.L.J.* 715, 717–19 (1989), but we won't have to worry about them in this case.

The background of the dispute can be sketched briefly. By passing the "Superfund" statute in 1980 Congress increased the exposure of enterprises to monetary liability for damage to the environment from toxic spills. Rhone–Poulenc (actually a predecessor, but we can omit that detail) was one of those enterprises. Between 1981 and 1984 it bought from International Insurance three identical policies insuring it against "Environmental Impairment Liability." Rhone–Poulenc already had a number of Comprehensive General Liability policies issued by other insurance companies, but there was uncertainty about the extent to which such policies covered liability for damaging the environment. Rhone–Poulenc bought still another policy from an affiliate (and codefendant) of International Insurance; we shall call it the ISLIC policy, after the affiliate's initials. It has significance to this appeal only for the light it may shed on the interpretation of the Environmental Impairment Liability policies.

After incurring heavy clean-up costs at several contaminated sites, Rhone–Poulenc submitted claims to International Insurance for reimbursement pursuant to the three Environmental Impairment Liability policies. These were "claims made" policies, that is, policies that insured against claims made against Rhone–Poulenc, rather than against liability-creating acts committed by it, during the period in which the policies were in force. International Insurance refused to pay Rhone–Poulenc's claims. It took the position that the policies were excess policies and that Rhone–Poulenc had not shown that it had exhausted its other insurance. That refusal precipitated this lawsuit, filed last year and dismissed on the ground that Rhone–Poulenc's Comprehensive General Liability insurers (19 in number!) were indispensable parties that Rhone–Poulenc had failed to join as defendants and could not join, because to do so would destroy complete diversity of citizenship and with it federal jurisdiction over this suit.

■ If the policies issued by International Insurance are pure primary policies, the district judge's ruling cannot stand. Other primary insurers *may* be indispensable parties in a suit by an insured against a primary insurer, *Evergreen Park Nursing & Convalescent Home, Inc. v. American Equitable Assurance Co.*, 417 F.2d 1113 (7th Cir. 1969), but it depends on the circumstances of the case. *Casualty Indemnity Exchange v. Village of Crete*, 731 F.2d 457, 461–62 (7th Cir.1984); *Schlumberger Industries, Inc. v. National Surety Corp.*, 36 F.3d 1274, 1286 (4th Cir.1994). Rule 19(b) sets forth a standard, not a rigid rule. The *Schlumberger* case characterizes our decision in *Evergreen* as laying down such a rule for suits against a primary insurer, see 36 F.3d at 1286, but we do not read it so. A party is indispensable only if it would be unjust (against "equity and good conscience," in the words of the rule) to allow the litigation to proceed in his absence. It is not always unjust for an insured with several primary insurers not to proceed against all of them. A victim of wrongdoing is not generally required to sue all the wrongdoers. Certainly not in a tort case, where the rule of joint and several liability reigns; and not in a contract case either. In a case of multiple, overlapping coverage the insurers who are not sued will not be bound by determinations made in a suit to which they are not parties, and the insurers who are sued can if they lose seek contribution afterward from the others, *Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034, 1050–51 (D.C.Cir. 1981), though this may depend, as we shall see, on the precise wording of each insurance contract. If all the policies here are primary,

the case would have to be remanded to allow the district judge to make a fresh determination whether any of the 19 primary insurers who were not sued are indispensable parties. There would be no presumption that they are.

■ But if the policies that International Insurance issued to Rhone–Poulenc are excess, the ruling dismissing the suit for failing to join indispensable parties was well within the scope of the district judge's authority in applying the standard of Rule 19(b). If those policies are excess, it would mean that International Insurance's liability is contingent on the liability of the Comprehensive General Liability insurers to Rhone–Poulenc, a liability that cannot be determined in the absence of those insurers. On this ground it has been held in the only cases that we have found on the issue, none of them appellate cases, that a suit against an excess insurer cannot proceed in the absence of the primary insurers until the latter have acknowledged their liability to the insured or have been determined by a court to be liable to him. *Witco Corp. v. Travelers Indemnity Co.,* 1994 WL 706076, at *4 (D.N.J. April 7, 1994); *Shell Oil Co. v. Aetna Casualty & Surety Co.,* 158 F.R.D. 395, 400–01 (N.D.Ill.1994); *City of Littleton v. Commercial Union Assurance Cos.,* 133 F.R.D. 159, 162–63 (D.Colo.1990). A more direct route to the conclusion that Rhone–Poulenc's suit against International Insurance was correctly dismissed if International Insurance's policies were excess, a route independent of Rule 19, is that the excess insurer's duty to indemnify does not attach until the insured has tried and failed to collect under his primary policies. Until then, the suit against the excess insurer is premature.

■ The determining question in this appeal is, therefore, the classification of the Environmental Impairment Liability policies as primary or excess. Each of the policies is for one year (twelve and a half months in the case of the first policy) and provides maximum coverage of $20 million for one claim, and $40 million for all claims, made against the insured while the insurance is in force, subject to a $2 million dollar deductible. The annual premium differs slightly among the three policies, averaging about $250,000 a year. The policies do not list any underlying insurance; nor is any of them labeled an excess insurance policy. But condition number 8 in each of them states:

> This Policy shall not be called upon in contribution and no liability shall attach hereunder for any injury, loss, damage, costs or expenses recoverable under any other insurance whether primary or excess inuring to the benefit of the insured except as regards any excess over and above the amounts collectible under such other insurance; PROVIDED ALWAYS that this clause shall not apply to any policy that is specifically arranged by the insured to cover limits in excess of those stated in this Policy. Nothing herein shall be construed to make this Policy subject to the terms, conditions and limitations of any other insurance.

This is the provision that, according to International Insurance, shows that the Environmental Impairment Liability policies are a form of excess policy if the insured has other coverage.

The policy issued by International Insurance's affiliate, the ISLIC policy, is, on its face anyway, quite different. The first words of the policy are "EXCESS INSURANCE POLICY." Item number 4, on the first page, is captioned "Underlying Insurance" and lists $20 million for one claim and $40 million in the aggregate "as per International Insurance Company policy # 560 000 039, forms on file with the company." The reference is to one of the Environmental Impairment Liability policies that International Insurance had issued to Rhone–Poulenc. The limits of the ISLIC policy are $10 million for one claim and $20 million in the aggregate, and the annual premium is $24,472. A subsequent amendment raised the policy limit to $20 million for one claim, for an additional premium of $2,336. As with each of the Environmental Impairment Liability policies, the term is approximately one year. Condition 8 in those policies does not appear in the ISLIC policy. Instead there are several provisions explaining in rather excruciating detail that the insurer has no obligation until the insured has exhausted his rights under

his other insurance policies. An endorsement states: "This policy is warranted to the exact terms and conditions as the primary policy except with respect to limit of liability and premium."

■ In arguing that the Environmental Impairment Liability policies are not excess policies, Rhone–Poulenc emphasizes the difference in wording between them and the ISLIC policy and also the difference in premiums. The premium for the ISLIC policy was a tenth as large as the premiums for each of the Environmental Impairment Liability policies even though the coverage (before the amendment) of the ISLIC policy was not a tenth but a half as large. This makes the Environmental Impairment Liability policies seem awfully expensive if they are merely excess policies; and the amount of consideration for a contract, while only rarely usable to invalidate the contract, is often a good clue to what the contract means, *In re Stoecker*, 5 F.3d 1022, 1029 (7th Cir.1993); *In re Kazmierczak*, 24 F.3d 1020, 1022 (7th Cir. 1993); *Mathieu v. George A. Moore & Co.*, 4 F.2d 251, 253 (N.D.Cal.1925), aff'd, 13 F.2d 747 (9th Cir.1926), since the payment and the performance specified in a contract usually are commensurate. But as ISLIC's coverage kicks in only after the $20–$40 million coverage of the underlying Environmental Impairment Liability policies is exhausted, it is less likely to be triggered and might therefore cost much less even if both sorts of policy are excess policies. Rhone–Poulenc further notes, however, that in issuing the Environmental Impairment Liability policies International Insurance did not inquire about Rhone–Poulenc's other insurance. The insurance company admits this. It also admits that the premiums it charged Rhone–Poulenc for Environmental Impairment Liability insurance were based purely on its estimate of Rhone–Poulenc's likely exposure during the policy period to claims for environmental damage and not on Rhone–Poulenc's other insurance coverage for liability for environmental damage, even though if the Environmental Impairment Liability policies were excess the likelihood that International Insurance would have to pay a claim under them would depend critically on the amount of Rhone–Poulenc's primary coverage.

The insurance company's position is that condition 8 is unequivocal in making the policies excess and the court should look no further, especially since Rhone–Poulenc is a large and thoroughly sophisticated consumer of insurance rather than some hapless individual sold a policy with incomprehensible boilerplate. The second clause (following "and") of the first sentence states that the insurer shall not be liable for any costs recoverable under any other insurance policy except insofar as they exceed the amounts collectible under the other policy or policies. So if Rhone–Poulenc incurred $15 million in clean-up costs and $5 million was recoverable from another insurance company, International Insurance would be liable to it for only $10 million. This is a correct literal interpretation and in addition the insurance company, wisely not content to rest on a purely literal reading of the policies, also has a plausible explanation for the striking difference in form between the Environmental Impairment Liability policy and the ISLIC policy. The former, it argues, is a hybrid of primary and excess coverage rather than a pure excess policy like the latter. In the early 1980s, the insurance company tells us, when the Superfund law greatly enlarged the potential liability of enterprises for environmental damage, the extent of coverage under existing liability policies was uncertain. The enterprises wanted to protect themselves from that uncertainty by buying insurance that would kick in only if the existing policies turned out not to provide adequate coverage of liability for environmental damage. In effect they wanted insurance against the possible inadequacy of their existing insurance. Hence the Environmental Impairment Liability policy, a specialized policy for environmental damage liability. Rather than attempt the impossible task of estimating the likelihood that the insureds' existing coverage was inadequate, the argument continues, International Insurance based its premiums for the new policy solely on the exposure of the insureds to liability for environmental damage, regardless of what insurance they might have against such liability. Since the premiums were calculated independently of any underlying insurance coverage, the poli-

cies do not list any of that coverage, as a pure excess insurance policy, illustrated by the ISLIC policy, would do.

International Insurance calls the Environmental Impairment Liability policies "excess by coincidence," meaning that whether the policy provides primary or excess coverage depends on the insured's other insurance coverage. *Employers Mutual Cos. v. Country Cos.*, 211 Ill.App.3d 586, 156 Ill.Dec. 52, 54–55, 570 N.E.2d 528, 530–31 (1991); 16 *Couch on Insurance* § 62:68 (2d ed. 1983) ("conditional exclusion from coverage"); Marick, *supra*, at 717–18. A pure excess policy, illustrated by the ISLIC policy, expands the limits of an identical policy that is primary. All it protects the insured against is the possibility that a claim will exceed the limits of the primary policy. An "excess by coincidence" policy, illustrating the broader category of policies that have "other insurance" clauses (of which more later), is excess if the insured happens to have some coverage under a different policy but primary if he does not.

■ International Insurance's characterization of its Environmental Impairment Liability policies as excess by coincidence may be correct, in which event the district court should be affirmed. But we cannot be very confident that it is correct. While the insurance company tells a beguiling story of the origin and purpose of the Environmental Impairment Liability policy, it offers no supporting documentation. The boilerplate of insurance policies is often the product of insurance industry trade groups rather than of the issuer of a particular policy. These standard conditions generally have a published or at least public "legislative" history which can be consulted for clues to the meaning of a provision. See, e.g., *Eljer Mfg., Inc. v. Liberty Mutual Ins. Co.*, 972 F.2d 805, 810 (7th Cir.1992). No more than real legislative history is the "legislative history" of insurance contracts entitled to conclusive weight. It is entitled to less weight, since it represents the views of only one side to the contract. But it is entitled to some consideration. Neither party has cited us to any "legislative history" of condition 8. Maybe there is none. Our own research has not

found any; nor have we found cases dealing with the same clause in policies issued by other insurance companies. But we would be more comfortable if the parties had advised us that there was no available or obtainable history of the clause.

More important in casting doubt on the soundness of International Insurance's position is the context of the clause. Every competent person engaged in translation or interpretation understands that you cannot figure out the meaning of a sentence just by looking up every word in it in the dictionary. The meaning of a sentence inheres in the relations among the words, relations given by the rules of grammar, and not just in the meaning of the words considered one by one in isolation from each other. To take a trivial example, the sentence "The cat swallowed the mouse" cannot be interpreted with the aid merely of a dictionary. The dictionary will tell you what a cat is and what a mouse is and what swallowed is, but it will not tell you who swallowed whom. By the same token the meaning of a paragraph inheres in the relations among the sentences that compose it rather than merely in each sentence taken one by one. "I have a pair of loafers" seems clear enough. But its meaning depends on whether the sentence preceding it is "I am disappointed with my research assistants this year" or "I have comfortable shoes."

■ In this case we have a sentence that has two independent clauses, the equivalent of sentences in a paragraph. International Insurance relies on the second clause. The first clause must not be ignored, however. It states: "This Policy shall not be called upon in contribution." The term "contribution" has a settled meaning in law. It refers to the right of two potentially liable persons to a sharing of the cost of that liability. One speaks for example of contribution among joint tortfeasors. The natural meaning for a lawyer to attach to the first clause is that it disclaims entitling other insurers of the insured to shift any of their liability to International Insurance. The disclaimer scotches any argument that other insurers are third-party beneficiaries of this insurance contract and so might claim over against International

Insurance if the insured went against other insurers instead. Rhone–Poulenc had 19 other liability insurers and might very well collect from one or more of them sufficient proceeds to cover its entire liability for environmental damage, in which event International Insurance would be off the hook completely if none of the other insurers could obtain contribution from it.

■ Now whether a disclaimer of liability for contribution in an insurance policy would actually be effective may be doubted. The right is not the insured's to disclaim. It is a right of other insurers, who are not parties to the insurance policy, and it is a right founded not on the concept of third-party beneficiaries of contracts and hence not on "the wishes of the insured" but rather on notions of equity and unjust enrichment. *Royal Globe Ins. Co. v. Aetna Ins. Co.,* 82 Ill.App.3d 1003, 38 Ill.Dec. 449, 403 N.E.2d 680 (1980); *Institute of London Underwriters v. Hartford Fire Ins. Co.,* 234 Ill.App.3d 70, 175 Ill.Dec. 297, 302–03, 599 N.E.2d 1311, 1316–17 (1992). The last-cited case, while reciting the general principle, appears to undermine it by holding that for the right of contribution to arise, the insured must have asked the insurer who later asserted the right to defend him, a rule that despite the court's disclaimer appears to make the right of contribution depend on the wishes of the insured. But the precise scope of the right of contribution among insurers under Illinois law is irrelevant to this appeal.

International Insurance contends that the word "contribution" in the policies is not being used in its legal sense at all but in its lay sense, in which one might say of an insurance company that by paying a claim by the insured it had "contributed" to the insured. This interpretation is possible but not inevitable, and International Insurance offers no evidence to support it. If "contribution" is being used in its legal sense, this tends to color a reader's interpretation of the second clause. We now see that the liability to which it refers could be liability just to other insurers, rather than to the insured. Even the phrase that is strongest for International Insurance—confining its liability to "any excess over and above the amounts collectible under such other insurance"—is,

we can now see, ambiguous. It could mean simply that, should another insurer happen to incur legal or other expenses in defending against a claim for an amount in excess of that insurer's policy limits—an amount therefore that International Insurance might well be called upon to pay but for a successful defense by that other insurer—the other insurer *would,* consistent with the right of contribution among insurers, be entitled to claim from International Insurance a contribution to those costs, since they had conferred a potential benefit on International Insurance. This would not obligate the insured to go after the other insurer.

■ As an original matter, therefore, we cannot be confident whether condition 8 makes the Environmental Impairment Liability policies excess in the sense contended for by International Insurance, or primary; and although ambiguities in insurance contracts are to be resolved against the insurer, this principle comes into play only after reasonable efforts at interpretation have failed, including the taking of evidence concerning the drafting or negotiation of the contract. *McNeilly v. Bankers United Life Assurance Co.,* 999 F.2d 1199, 1201 and n. 6 (7th Cir. 1993); *Weyerhaeuser Co. v. Aetna Casualty & Surety Co.,* 123 Wash.2d 891, 874 P.2d 142, 145 (1994); *First State Underwriters Agency v. Travelers Ins. Co.,* 803 F.2d 1308, 1314 n. 5 (3d Cir.1986). That has not been done yet. Although every effort should be made to resolve the meaning of an insurance contract without putting the insured to the expense of a trial, cf. Robert E. Keeton & Alan I. Widiss, *Insurance Law* 263–64 (1988), this is not possible in all cases. It may not be possible here. Then again it may be. We do not foreclose the possibility that the case can be resolved on summary judgment after submission of evidence concerning the background and intended meaning of the contested clause; for the evidence may be uncontested.

All this points to the necessity of a remand. But before we can be sure that this is the right course we must be sure that the interpretive dispute has not been resolved by judicial interpretation of similar or identical language in other insurance contracts. It has not. The cases that the parties have cited to us deal with a different question, the effect of an "other insurance" clause (the

genus of which condition 8 is a species) in two or more policies issued to the same insured. E.g., *Putnam v. New Amsterdam Casualty Co.*, 48 Ill.2d 71, 269 N.E.2d 97, 99–103 (1970); *Zurich Ins. Co. v. Northbrook Excess & Surplus Ins. Co.*, 145 Ill.App.3d 175, 98 Ill.Dec. 512, 528, 494 N.E.2d 634, 650 (1986), aff'd under the name of *Zurich Ins. Co. v. Raymark Industries, Inc.*, 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150 (1987); *Home Ins. Co. v. Certain Underwriters at Lloyd's London*, 729 F.2d 1132, 1136 (7th Cir.1984); Keeton & Widiss, *supra*, at 263. Suppose, to take the simplest case, that each policy states that it is inapplicable if the insured is covered by other insurance. Such a series of identical conditions cannot be enforced. That would leave the insured with no insurance, even though he had bought much insurance. So the courts invalidate the identical conditions and require each insurer to contribute pro rata to the satisfaction of the insured's claim, in effect converting a series of excess policies into primary policies. That is not an issue in this case. There is no suggestion that Rhone–Poulenc's Comprehensive General Liability policies are excess.

Rather than guess in a vacuum whether an Environmental Impairment Liability policy is primary or excess insurance—a question that for all we know has large financial implications for enterprises that have substantial exposure to liability for environmental damage, and for their insurers—we think it the prudent course to vacate the judgment dismissing Rhone–Poulenc's suit for failure to join indispensable parties and to remand the matter for further proceedings to determine the meaning of condition 8. If the district court determines that the Environmental Impairment Liability policies are "excess by coincidence" policies it should reinstate the Rule 19(b) order and the judgment dismissing the suit, while if the court finds that the policies are primary it should conduct a fresh inquiry into whether Rhone–Poulenc's other primary insurers are indispensable parties to this suit.

VACATED AND REMANDED, WITH DIRECTIONS.