[No. 61000-2. En Banc. May 19, 1994.]

WEYERHAEUSER COMPANY, *Appellant*, v. AETNA CASUALTY AND SURETY COMPANY, ET AL, *Defendants*, CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, ET AL, *Respondents*.

*Perkins Coie,* by *Charles C. Gordon, Jeffrey I. Tilden,* and *Jeffrey M. Thomas; Anderson Kill Olick & Oshinsky, P.C.,* by *Eugene R. Anderson, Robert M. Horkovich, William G. Passannante,* and *Peter J. Andrews;* and *Gabriel E. Gedvila, Assistant General Counsel,* for appellant.

*Williams, Kastner & Gibbs,* by *Frankie Adams Crain; Lane Powell Spears Lubersky,* by *William A. Pelandini* and *Raymond S. Weber; Gaitan & Cusack,* by *Kenneth J. Cusack* and *William F. Knowles; Bliss Riordan,* by *Carl E. Forsberg,* for respondents.

*Mark S. Parris, Peggy J. Williams, David M. Brenner, Robert N. Sayler, John G. Buchanan III, William F. Greaney,* and *Thomas M. Reiter* on behalf of Boeing, Paccar, Asarco, Univar, Washington Natural Gas, Aluminum Co. of America, and Northwest Alloys, amici curiae for appellant.

*Mark S. Parris* and *Peggy J. Williams* on behalf of the Association of Washington Cities, amicus curiae for appellant.

*Christine O. Gregoire, Attorney General,* and *Kathryn L. Gerla, Assistant,* amicus curiae for appellant.

*Thomas S. James, Jr., Laura A. Foggan, John E. Barry,* and *Jonathan M. Shaw* on behalf of Insurance Environmental Litigation Association, amicus curiae for respondents.

ANDERSEN, C.J. —

## FACTS OF CASE

In 1992, the Weyerhaeuser Company filed a declaratory judgment action against many of its insurers seeking a declaration of coverage with regard to alleged property damage at some 42 allegedly polluted sites in a number of states.

The insurance policies involved were issued over a period of time from approximately 1951 through 1985. The policies were described as various primary, umbrella, and excess Comprehensive General Liability policies. The defendant insurers presently remaining in the case all appear to be excess insurers. Weyerhaeuser asserts that some policies contain a standard form qualified pollution exclusion while some contain somewhat different language regarding pollution damages. The actual portions of the insurance contracts regarding exclusions or limitations to coverage are not before us.

The insurers filed a motion for summary judgment with regard to 18 of the sites arguing that there was no coverage because the government environmental agencies involved in the cleanup efforts at the various sites had not yet filed legal actions or threatened to do so. The trial court granted summary judgment and dismissed Weyerhaeuser's complaint with prejudice, with regard to 15 of those sites. The basis for the trial court's order was that "there is no claim by a third party of liability to pay damages because of property damage . . ." The remediation costs for the sites at issue in this part of the case are alleged to be approximately $28 million.

The motion for summary judgment was denied as to three sites: Lemberger, Wisconsin, Lunenberg, Massachusetts, and Asheville, North Carolina. The insurers withdrew the Lemberger and the Lunenberg sites from their motion because one was the subject of a third party claim and the other involved receipt by Weyerhaeuser of a PRP (potentially responsible party) letter. The trial court refused to grant the motion with regard to the Asheville site on the basis of "the tenor of the letter [from the state agency] and the threats imposed". The trial court found the actual or threatened use of legal process to be evident from the agency's letter.

Two of the fifteen sites were also the subjects of different motions for summary judgment which were granted on other grounds than those advanced in this appeal. The trial court's

Summary Judgment Order in this case includes the Enumclaw and Mt. Solo sites in its grant of summary judgment, but notes that these two sites have also been dismissed on other grounds in separate orders. Enumclaw was dismissed due to an "owned property exclusion". The parties stipulated that all claims regarding Mt. Solo were dismissed.

A large portion of the record in this case is sealed by court order pursuant to the parties' stipulation regarding confidential and privileged information revealed in discovery. We have carefully reviewed the entire record and conclude that a detailed site-specific factual description of the governmental action which occurred at each of the various sites is unnecessary to the reader's understanding of the resolution of the present issue. Therefore, in light of the trial court's confidentiality order, we do not include site-specific details regarding the various allegedly polluted sites. The following generalized statement of facts is sufficient to frame the legal question.

Generally, Weyerhaeuser was proceeding with efforts to clean up what is alleged to be pollution damage at various sites in cooperation with government environmental agencies. The Weyerhaeuser remediation managers for the sites submitted affidavits stating that the work undertaken was mandated by various state and federal statutes which impose strict, joint and several liability for pollution damage. Some of the sites allegedly involved situations where Weyerhaeuser was required by law to report leaks or spills or contamination to government authorities. A number of the sites allegedly involve contamination of the groundwater. The correspondence between Weyerhaeuser and some of the environmental authorities refers to meetings between Weyerhaeuser and the authorities and monitoring by the agencies of the cleanup efforts. A number of the sites have been listed by the State of Washington Department of Ecology (DOE) on the hazardous sites list pursuant to the Model Toxics Control Act, RCW 70.105D.

Weyerhaeuser submitted an affidavit from Carol Fleskes, program manager of the Toxics Cleanup Program of the

DOE, which states that under RCW 70.105D.040, the owner or operator of a facility is strictly liable, jointly and severally, for all remedial action costs resulting from the release of hazardous substances. Fleskes stated that the DOE maintains a hazardous sites list containing the names of sites at which the DOE has determined remedial action is necessary and sites are ranked according to the Washington Ranking Method Scoring Manual with sites having the highest priority given a ranking of "1" and the lowest a ranking of "5". As sites with higher priority rankings are remedied and removed from the list, sites with lower rankings will be re-ranked. Fleskes states that in the absence of an independent remedial action that satisfies the DOE, any site listed on the hazardous sites list will at some point in time become the subject of a cleanup initiated by the DOE. This last statement is corroborated in the amicus brief submitted by the DOE which cites to RCW 70.105D.050(1).

Weyerhaeuser appealed the grant of summary judgment to the Court of Appeals. This court accepted certification from the Court of Appeals.

One ultimate issue is here presented.

## ISSUE

Can there be insurance coverage under a Comprehensive General Liability policy for property damage when the policyholder has incurred environmental cleanup costs pursuant to statute, but where the involved government environmental agency has not made an overt threat of formal legal action?

## DECISION

CONCLUSION. We conclude that Comprehensive General Liability (CGL) insurance policies, which provide coverage for all sums which the insured shall be obligated to pay by reason of the liability imposed by law for damages on account of property damage, may provide coverage when an insured engages in the cleanup of pollution damages in cooperation with an environmental agency. Such policies can reasonably be read to provide coverage for actions taken

to clean up pollution damages required under environmental statutes which impose strict liability for such cleanup.

A summary judgment may be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The court must consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party.[1]

The interpretation of insurance policies is a question of law and the language of the policy is to be interpreted in accordance with the way it would be understood by the average person, rather than in a technical sense. An ambiguity exists in an insurance contract if the language is fairly susceptible to two different reasonable interpretations. If the court cannot resolve an ambiguity by resort to extrinsic evidence, it will apply the rule that ambiguities in insurance contracts are construed in favor of the insured.[2]

While the insurance policies are not included in the record, the parties agree that the relevant policy language in the many policies involved contains the same or materially similar language to the following:

> The [Liability Insurance] Company hereby agrees, subject to [various terms, conditions, limits and exclusions not pertinent for purposes of this appeal], to indemnify the Assured for *all sums which the Assured shall be obligated to pay by reason of the liability,*
>
> (a) imposed upon the Assured by law, . . .
>
> . . .
>
> for damages, . . . on account of:
>
> . . .
>
> (ii) *Property Damage.*[3]

(Some italics ours.) The emphasized language is the focus of the current dispute.

Weyerhaeuser, and various amici, argue that the liability imposed by environmental statutes, which impose strict lia-

---

[1] *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

[2] *American Star Ins. Co. v. Grice,* 121 Wn.2d 869, 874-75, 854 P.2d 622 (1993), *opinion supplemented,* 123 Wn.2d 131, 865 P.2d 507 (1994).

[3] Clerk's Papers, at 350-51. See also Clerk's Papers, at 7; Br. of Appellant, at 12; Br. of Resp't, at 5; Reply Br., at 12.

bility for cleanup of pollution damages, gives rise to liability coverage under CGL policies which promise repayment of sums which the insured "shall be obligated to pay by reason of the liability, . . . imposed upon the Assured by law". One of the statutes cited by the parties is the Washington Model Toxics Control Act. Generally, under that act, current owners and operators of contaminated facilities are liable, as are owners and operators at the time the hazardous substances were released and certain persons who arranged for disposal, treatment, or transport and certain generators and vendors of hazardous substances. RCW 70.105D.040. The act establishes specific mechanisms whereby the DOE can investigate, declare "potentially liable persons" and require the cleanup of hazardous waste sites.[4] RCW 70.105D.040(2) provides in pertinent part:

> Each person who is liable under this section is strictly liable, jointly and severally, for all remedial action costs and for all natural resource damages resulting from the releases or threatened releases of hazardous substances.

The DOE is given broad power to conduct, or require potentially liable persons to conduct, remedial actions, RCW 70.105D.030, and may impose severe fines and penalties for the failure to comply with the Department's orders, RCW 70.105D.050.

The Model Toxics Control Act was based, in part, upon the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.*, which also imposes liability on those that are responsible for releasing hazardous substances into the environment.[5] CERCLA provides that any person or entity responsible for a release of hazardous substances shall be liable for all costs of remedial action.[6]

---

[4]*Bird-Johnson Corp. v. Dana Corp.*, 119 Wn.2d 423, 426, 833 P.2d 375 (1992).

[5]*See, e.g., A.Y. McDonald Indus. v. Insurance Co. of N. Am.*, 475 N.W.2d 607, 629 (Iowa 1991).

[6]Mitchell L. Lathrop, *Insurance Coverage for Environmental Claims* § 2.06[5], at 2-57 (1992) (responsible parties are strictly liable under CERCLA); 42 U.S.C. § 9607.

The insurers argue that liability coverage insures against the risk that the policyholder might become legally obligated to pay damages, not that the policyholder might incur expenses in order to comply with laws and regulations of general application. As discussed more fully later, under Washington law "damages" under a CGL insurance policy include environmental cleanup costs.[7] However, the insurers argue that a legal obligation to pay damages cannot arise unless and until some third party asserts a claim or makes an overt threat to do so. The insurers conceded (solely for purposes of their motion) that an Environmental Protection Agency "PRP" letter (an EPA notice under CERCLA that someone is a "potentially responsible party"), a consent order, a formal notice of violation which threatens enforcement action, or a third party demand letter could be evidence that a third party is seeking to impose a legal liability for damages. None of these types of documents have been issued with regard to any of the sites at issue here.

The insurers concede that some or all of the sites are polluted, but they argue that there is no insurance coverage under the CGL policies because Weyerhaeuser is not legally obligated to third parties for damages. The insurers argue that there must be a "third party"[8] who acts in an "adversarial" manner to the insured in order to have coverage under these policies. The argument is based on the absence of a "claim" or third party demand or threat. It is the insurers' position that there needs to be some "coerciveness", some "adversarial" conduct by a government agency, or no coverage can exist.

Weyerhaeuser concedes that the governmental claimants have not actually used, or expressly threatened in writing to use, legal process against it to coerce payment or conduct.

---

[7]*Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 784 P.2d 507, 87 A.L.R.4th 405 (1990).

[8]No one contends that federal, state or local governments fail to qualify as potential third party claimants. The insurers concede that the State is as eligible as a private party to be a third party claimant. See Answer of Resp't to Br. of Amicus Boeing, at 13.

It argues, however, that a policyholder does not have to stop its environmental cleanup efforts and wait to be sued in order to obtain the benefits of liability insurance policies it purchased to cover liabilities arising out of property damage when the policyholder already faces statutory liability because of environmental property damage.

In the summary judgment proceeding, Weyerhaeuser submitted an affidavit of the director of the Toxic Solid Waste Team which states in part as follows:

5. Weyerhaeuser's general practice with regard to its environmental liabilities, including [the sites involved in this case], is to minimize Weyerhaeuser's liability to clean-up damaged property. Forcing the various state and federal authorities to bring formal enforcement proceedings against Weyerhaeuser usually leads to greatly increased liability and expenses. These increased liabilities include transactions costs and the increased costs associated with a remedy unilaterally selected by the government. At sites where Weyerhaeuser allegedly is liable for environmental property damage, prudent action and dialogue with the environmental authorities minimizes Weyerhaeuser's ultimate liabilities.

6. Environmental property damage if not addressed almost always gets worse (and much more expensive to remedy) over time. Where Weyerhaeuser is liable for property damage at a site, prompt response prevents further damage to the environment and may greatly reduce the expense to clean-up damaged property. For example, doing nothing while damaged groundwater at a site migrates to and damages an aquifer can increase Weyerhaeuser's liability by orders of magnitude.

7. It is Weyerhaeuser's practice to report to the proper state or federal authorities environmental damage that Weyerhaeuser is required to report under applicable state or federal law.

Aff. of James P. Odendahl; Clerk's Papers, at 127-28.

Whether an environmental agency has to overtly threaten to take legal action against a policyholder before coverage can be sought under a CGL policy is not directly addressed by Washington law. Both sides of this controversy cite to *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 784 P.2d 507, 87 A.L.R.4th 405 (1990). In *Boeing* this court was construing a comprehensive general liability insurance policy in a case involving pollution damages. The issue there was whether environmental response costs, paid by

the insured as a result of action taken by the government pursuant to an environmental statute (CERCLA), were "damages" within the meaning of the CGL policy. The damages in *Boeing* involved contamination of groundwater and the third parties involved were the Federal Environmental Protection Agency and the State of Washington. We held in that case that the response costs incurred under CERCLA were "damages" within the meaning of a CGL policy to the extent that these costs were incurred because of property damage.[9] The great weight of authority from other state appellate courts agrees that cleanup costs incurred under environmental statutes constitute property damage for purposes of CGL policies.[10]

We also said in *Boeing*, " 'coverage does not hinge on the form of action taken or the nature of relief sought, but on an actual or threatened use of legal process to coerce payment or conduct by a policyholder.' "[11] Weyerhaeuser relies on the first part of this sentence while the insurers rely on the last part. However, what kind of a threat is necessary, and how overt it needs to be, were not issues in *Boeing* since in that case the EPA and the State had already filed suit against the Boeing Company. Accordingly, we do not consider this one sentence dispositive either way since the issue before us now was not an issue being considered in *Boeing*.

The insurers rely upon the case of *Ryan v. Royal Ins. Co. of Am.*, 916 F.2d 731 (1st Cir. 1990) for the proposition that a property owner does not become legally obligated to pay damages simply because its property is polluted, because environmental liability is strict, and because a governmental agency is aware of the pollution and "desires" to see it cleaned up. *Ryan* is only one of many cases which primarily

---

[9]*Boeing*, 113 Wn.2d at 887.

[10]*E.g., Aerojet-General Corp. v. Superior Court*, 211 Cal. App. 3d 216, 229-30, 257 Cal. Rptr. 621, 629, 258 Cal. Rptr. 684 (1989) (and cases cited therein); *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 818-19, 799 P.2d 1253, 274 Cal. Rptr. 820, 829-30 (1990) and cases cited therein.

[11]*Boeing*, 113 Wn.2d at 878 (quoting *Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp.*, 662 F. Supp. 71, 75 (E.D. Mich. 1987)).

address the issue of when an insurer's "duty to defend" its insured is triggered. Under standard form CGL policies, the duty to defend usually arises when there is a "suit" and the older standard policies often failed to define "suit". The case law across the country is split on what constitutes a "suit" for purposes of the duty to defend.[12]

■ However, the duty to defend and the duty to indemnify are different duties under a CGL policy.[13] In the present case (presumably because the remaining Defendants are excess insurers) there is no argument regarding the "duty to defend" nor on the legal meaning of the word "suit". The insurers are not arguing there is no duty to defend; they are arguing that there is no duty to indemnify. Therefore, the *Ryan* case rationale, if at all helpful here, is only helpful by analogy. The *Ryan* court's holding that an agency's correspondence to an insured must be "coercive or adversarial" applies to the issue whether there is a "suit" which the insurer has a "duty to defend" against. Under *Ryan*, although a lawsuit need not be commenced in order to constitute a "suit", there must be more than an invitation to initiate cleanup in order to animate the insurer's duty to defend.[14]

The insuring clause here, however, does not require a "suit"; it requires coverage for all sums the insured shall be obligated to pay by reason of the liability imposed upon the insured by law. We therefore decline to hold that the standard used in *Ryan* to determine the duty to defend against a suit should be used to determine whether there may be a duty to indemnify. Despite the *Ryan* court's holding, it does not appear this conclusion should follow when the question of indemnification is at issue. The two duties, to defend and to indemnify, should be examined independently.

---

[12]*See* Mitchell L. Lathrop, *Insurance Coverage for Environmental Claims* § 3.04, at 3-37 through 3-46 (1992).

[13]*See* Lathrop § 8.03[1][a], at 8-24; *A.Y. McDonald Indus. v. Insurance Co. of N. Am.*, 475 N.W.2d 607, 627 (Iowa 1991).

[14]*Ryan v. Royal Ins. Co. of Am.*, 916 F.2d 731, 741 (1st Cir. 1990).

We find some guidance in cases from other jurisdictions and from scholarly authority. In *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 764-65, 625 A.2d 1021, 1024 (1993), the insured under a CGL policy initiated the cleanup of pollution without legal proceedings having been formally filed against it by a third party, and without a written administrative directive by a government agency that it take such action. The company worked in a "cooperative arrangement" with the state in order to "avoid being subjected to an administrative order to perform the work."[15] Similar evidence is present in the record of the case before us.

In *Bausch & Lomb*, that company had argued that the CGL policy covered costs to remove contaminated matter in "obedience to the State's statutory and regulatory commands".[16] The insurer argued that the policy insured only against harm done to a third party who "demands compensation for the loss" and that the policyholder, in voluntarily cleaning up, "merely complied with one of myriad government regulations, the expense of which compliance is a cost of doing business".[17] These respective positions are very similar to the arguments made in the present case. The policy language involved in the *Bausch & Lomb* case is almost identical to the language of the policies in this case.[18]

In that case, the high court of Maryland, in examining the policy language "shall become legally obligated to pay", concluded as follows:

> B & L acted throughout in a cooperative manner with State regulators in assessing the pollution's extent and devising plans to treat it. It is less certain that B & L acted purely voluntarily in doing so. First, all parties concede that the relevant environmental statutes . . . impose strict liability upon the owners of polluted property; the statutes further grant the State the authority to enforce the laws either by

---

[15]*Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 769, 625 A.2d 1021, 1026-27 (1993).

[16]*Bausch & Lomb*, 330 Md. at 776, 625 A.2d at 1030.

[17]*Bausch & Lomb*, 330 Md. at 776, 625 A.2d at 1030.

[18]*Bausch & Lomb*, 330 Md. at 764-65, 625 A.2d at 1024.

administrative order, by injunction, or by the State's own, direct remediation at the owner's expense. . . .The *tacit threat* of formal State intervention was thus always present in B & L's dealings with the State regulators.

Second, the immediate contacts between B & L and State personnel carried weight in the clean-up project. State regulators reviewed and approved B & L's studies and subsequent remediation program; *implicit in their approval was the power to disapprove, and demand that more be done. To be sure, the State agents did not adopt an overtly adversarial and coercive posture towards B & L. The State did not sue the company. It issued no order. See Ryan v. Royal Ins. Co. of America,* 916 F.2d 731, 736-743 (1st Cir.1990) (under New York law, State's mild statements did not create showing of probable and imminent governmental action required as a condition precedent to insurance coverage). Yet "polite but puissant compulsion" may inhere to State regulatory activities, especially when, as here, the regulators actively monitor the clean-up. *A.Y. McDonald Industries [v. Insurance Co. of N. Am.],* 475 N.W.2d [607,] 620 (quoting *Aerojet-General Corp. v. Superior Court,* 211 Cal.App.3d 216, 228, 257 Cal.Rptr. 621, 628 (1989)). B & L ultimately faced the task of complying with the environmental laws, and paying the costs of compliance. As such, for the purposes of this analysis, we accept the trial court's finding that *B & L's response costs, undertaken in the regulatory context, represented a sum the corporation was legally obligated to pay.*

(Italics ours.) *Bausch & Lomb,* 330 Md. at 779-80, 625 A.2d at 1031-32.

■ We agree with this conclusion. There are many similarities between the present case and the *Bausch & Lomb* case on the issue now before us.[19] In the present case, the record shows that there were many sites where Weyerhaeuser was working with State officials in the cleanup processes; there was contact between Weyerhaeuser and state environmental officials regarding pollution at the various sites. Weyerhaeuser officials claim that as to all the sites, Weyerhaeuser was acting under government mandate to comply with applicable environmental statutes. The insurers do not refute Weyerhaeuser's contention that state and federal laws generally impose strict liability on pol-

---

[19]The *Bausch & Lomb* court found no coverage based on another issue which is not before this court.

luters. *See, e.g.,* Model Toxics Control Act, RCW 70.105D; CERCLA, 42 U.S.C. § 9601 *et seq.*

The insurers argue that if coverage is allowed in this case, then coverage would be allowed for a policyholder's costs of compliance with all laws. We perceive this to be an unfounded fear. The insurers in *Aerojet-General Corp. v. Superior Court*, 211 Cal. App. 3d 216, 257 Cal. Rptr. 621, 258 Cal. Rptr. 684 (1989) also made the argument that the insurer could be made to pay the policyholder's cost of compliance with all government safety regulations (such as OSHA regulations) or for prophylactic safety measures taken in advance of any damage to property. That court correctly addressed that concern by noting that in none of those situations was there liability *"because of property damage"*.[20] Our opinion in *Boeing* is also clear that "preventive measures taken before pollution has occurred are not costs incurred because of property damage" and that the term "damages" does not cover safety measures or other preventive costs taken in advance of any damage to property.[21]

There may be insurance coverage under a CGL policy because of costs incurred in the regulatory setting, but only if there is property damage. We are not in any way suggesting that the ordinary costs of doing business can be passed along from a policyholder to its insurer. Additionally, the environmental statutes are not simply laws of general applicability with which all companies have to comply in the ordinary course of business; they are laws which impose strict liability on those that are liable because pollution has caused property damage. As such, they are not laws which just deal with general costs of doing business; rather, they are laws that make a polluter strictly liable.[22]

---

[20]*Aerojet-General Corp. v. Superior Court*, 211 Cal. App. 3d 216, 234-36, 257 Cal. Rptr. 621, 633, 258 Cal. Rptr. 684 (1989).

[21]*Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 886-87, 784 P.2d 507, 87 A.L.R.4th 405 (1990).

[22]*See Bausch & Lomb*, 330 Md. at 776-80, 625 A.2d at 1030-32.

Furthermore, Weyerhaeuser concedes that it is *not* asking its insurers for reimbursement of any of the following: expenses routinely incurred as a part of its costs of business; the costs of making capital or aesthetic improvements to its own property; a bond guaranteeing its own compliance with laws and regulations; fines or penalties; costs incurred by Weyerhaeuser "voluntarily" (if there are any); the cost of any activity or condition to comply with *any* law; or bank financing for capital improvement projects.

We also find the case of *Compass Ins. Co. v. Cravens, Dargan & Co.*, 748 P.2d 724 (Wyo. 1988) to be pertinent. There, the policyholder had immediately cleaned up an oil spill which had damaged adjacent property. No formal complaint had been made by any third party. The relevant policy language in *Compass* was essentially the same as in the present case (all sums the insured shall become legally obligated to pay as damages because of property damage). The insurer argued that it had to pay only damages for which the policyholder was "legally liable" and that the policyholder was not legally liable for the costs of cleaning up the property of a third party because no notice of claim had been filed. The *Compass* court held that the insurer's contention that there was no legal liability because no formal claims had been filed was without merit. As that court explained:

> If the insurer's promise to pay is to be of any practical value, it must include an obligation of good faith and reasonableness. From the beginning, the [policyholder] was in a dilemma. If it did nothing to clean up the oil spill, the damages would be much greater. The damages would be much greater even if it waited only for determinations as to who was liable and who would direct the cleanup. An oil spill into flowing water, by its nature, requires an immediate clean-up response. That no formal claims were filed is a credit to the [policyholder's] clean-up efforts, not an excuse for [the insurer] to deny coverage. The principles of good faith and reasonableness require the insurer, under these circumstances, to acquiesce to the clean-up efforts.

*Compass*, 748 P.2d at 728-29. *See also Upjohn Co. v. New Hampshire Ins. Co.*, 178 Mich. App. 706, 720, 444 N.W.2d

813, 819 (1989) (it makes no difference that the policy-holder took the remedial action before being ordered to do so and such swift remedial action should be encouraged rather than discouraged), *rev'd on other grounds*, 438 Mich. 197, 476 N.W.2d 392 (1991); *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 181-82 (Minn. 1990) (an insured could reasonably expect a CGL policy to provide coverage for any economic outlay compelled by law to rectify damage caused by the insured's acts or omissions).

In the recent case of *Maryland Cas. Co. v. Wausau Chem. Corp.*, 809 F. Supp. 680, 686 (W.D. Wis. 1992) the CGL insurer had declined coverage and refused to take any action until a lawsuit had been filed against the policyholder. In discussing the issue whether a voluntary agreement by a polluting policyholder with an environmental agency relieved the insurer from any duty to insure, the court explained as follows:

> The majority of courts addressing this issue have held that costs incurred when an insured engages voluntarily in cleanup activities in advance of litigation are covered under comprehensive general liability policies. Although [the insured] did appear to have a choice of engaging in negotiations with EPA [Environmental Protection Agency] or holding back and refusing to comply until forced, this choice was superficial at best. The legislative history of CERCLA provides evidence that the stiff penalties for failure to negotiate with EPA were intended to make the primary force behind cleanup efforts voluntary settlements, rather than drawn-out litigation. *See* H.R.Rep. No. 253, 99th Cong., 2d Sess., pt. 1 at 101 (1985), U.S.Code Cong. & Admin. News 1986, 2835, 2883 ("negotiated private party actions are essential to an effective program for cleanup of the nation's hazardous waste sites and it is the intent of this Committee to encourage private party cleanup at all sites"). To hold that such settlements are "voluntary" for purposes of an insurance policy exclusion would frustrate the intent of Congress.

(Citations omitted.) *Maryland Casualty*, 809 F. Supp. at 696.

Amicus, DOE, represents to this court that independent remedial actions form an integral part of the Model Toxics Control Act program in Washington and that the trial court's ruling, if upheld, is likely to encourage parties who

would have commenced or continued independent remedial actions to await formal enforcement by the State in order to avoid losing any potential for insurance coverage. Because the trial court's ruling creates a disincentive to engage in independent cleanups, the DOE maintains that the effect of the ruling will be to dramatically slow the progress of hazardous waste cleanup in Washington.

While *Maryland Casualty* is distinguishable on the basis that the policyholder had there entered into a consent decree following its negotiations with the EPA, the case does underscore the potential dangers to a policyholder of refusing to negotiate with state and federal environmental agencies.[23]

We do not consider a threat of legal action in an agency's letter to make a policyholder any more "legally obligated to pay damages" than an environmental statute which imposes strict liability on the polluting policyholder. Aside from duty to defend cases, the insurers cite no cases which relieve an insurer from the duty to indemnify because an environmental agency has not been sufficiently hostile. To the contrary, a number of cases focus on the statutory duty of a polluter to clean up a site.[24]

---

[23]*See also Aetna Cas. & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1517 (9th Cir. 1991) (lack of cooperation may expose the insured, and potentially its insurers, to much greater liability, including the EPA's litigation costs); *A.Y. McDonald Indus. v. Insurance Co. of N. Am.*, 475 N.W.2d 607, 628-29 (Iowa 1991) (explaining the dangers to a polluter in ignoring an agency demand for participation in remedial action and noting that early involvement in the settlement discussions is often crucial to protect one's interest).

[24]*See Lansco, Inc. v. Department of Envtl. Protec.*, 138 N.J. Super. 275, 350 A.2d 520, 88 A.L.R.3d 172 (1975) (agency informed policyholder of obligation by law to clean up and, if it did not, the agency would bill for cleanup; court held the policyholder was legally obligated to clean up under a statute which imposed liability on the owner regardless of fault and the insurer was obligated to indemnify its insured), *aff'd*, 145 N.J. Super. 433, 368 A.2d 363 (1976), *certification denied*, 73 N.J. 57, 372 A.2d 322 (1977); *New Castle Cy. v. Hartford Accident & Indem. Co.*, 673 F. Supp. 1359, 1366 (D. Del. 1987) (although agency did not file, or threaten to file, a legal proceeding, it required that certain measures be taken and the court recognized the agency had the power to enforce corrective steps necessary to protect the environment; the insurers' duty to indemnify therefore included costs to comply with the agency's letter which would have been ultimately enforceable in a legal proceeding), *aff'd in part, rev'd in part*, 933 F.2d 1162 (3d Cir. 1991); *Domermuth*

The insurers rely upon insurance texts which explain the difference between first party insurance and third party insurance. Third party insurance involves protection for the policyholder for liability it incurs to someone else, while first party involves protection for losses to the policyholder's own property.[25] While insurance texts do make this distinction, and while it has some relevance to the issue before us, the real issue here is whether *liability imposed by environmental statutes* can be sufficient to trigger coverage for property damage under a CGL policy. Weyerhaeuser is not arguing that it has first party coverage for damage to its own property;[26] it is arguing that the liability imposed by law (the policy requirement) is satisfied by Weyerhaeuser's liability under pollution statutes and it does not need to await the overt threat of suit before cleaning up pollution damage. Insurance coverage in the environmental claims area may be quite different than in other insurance settings. Environmental statutes impose liability, often without fault, on polluters in order to safeguard society in general. As one text which makes the classic first/third party distinction explains:

In the environmental coverage context, courts have held that it makes no difference whether the insured voluntarily

---

*Petroleum Equip. & Maintenance Corp. v. Herzog & Hopkins, Inc.*, 111 A.D.2d 957, 958, 490 N.Y.S.2d 54, 56 (1985) (the cleanup of the oil spill was not a voluntary act but an obligation imposed by the statute; insurer was obligated to indemnify); *Aerojet-General*, 211 Cal. App. 3d at 228 (the insured became legally obligated to clean up its pollution by virtue of the polite but powerful compulsion of CERCLA).

[25]*See Rones v. Safeco Ins. Co. of Am.*, 119 Wn.2d 650, 655, 835 P.2d 1036 (1992).

[26]In a summary judgment motion which is not the subject of this review, the insurers alleged that the policies involved provide coverage only for sums Weyerhaeuser becomes obligated to pay by reason of liability imposed by law for damages because of injury to property *other than property owned by Weyerhaeuser*. This was the other basis for the summary judgment with regard to the Enumclaw site, in which the insurers argued that no damage was done to other than Weyerhaeuser's own property and that there was no damage to groundwater or adjoining property. The insurers apparently prevailed on that motion but did not yet raise that issue as to the remainder of the allegedly polluted sites. This "owned property" issue is not involved in the review now before this court.

cleans up the contamination for which it is responsible prior to government demand or waits until after government intervention.

1 Tod I. Zuckerman & Mark C. Raskoff, *Environmental Insurance Litigation* § 3.02, at 3-8 (1992).

A number of commentators have expressed the concern that the environment will suffer severe harm if owners have to postpone a cleanup until a clear third party claim prompts a lawsuit. One recent text[27] explains that claims for coverage for environmental cleanup arise in three contexts: the insured may be held liable for the costs of cleanup incurred by a third party (typically the federal government or a state); the insured may incur cleanup costs pursuant to administrative order, judicial injunction, or consent decree directing cleanup; or the insured may voluntarily undertake cleanup, possibly in anticipation of incurring one of the forms of liability just described. The author points out that if the three forms of liability were treated differently for insurance coverage purposes, the policyholder would have a strong incentive not to undertake voluntary cleanup which, in turn, would delay cleanup, exacerbate the degree of contamination and increase the ultimate cost of cleanup. He also observed that it would severely impede the ability of the federal and state governments to accomplish cleanup at the thousands of contaminated sites extant. This author notes that most courts (either implicitly or explicitly) have consequently, and he deems correctly, treated all three contexts the same.

Amici Boeing et al. argue that the insurers' position here is inconsistent with their position that policyholders must take action to halt further harm from contamination or else forfeit coverage. We agree. Amici point out that insurers typically argue that coverage is forfeited for harm that could have been avoided or mitigated or that the harm

---

[27]Kenneth S. Abraham, *Environmental Liability Insurance Law* 58-61 (1991). *See also* Stephen Mountainspring, Comment, *Insurance Coverage of CERCLA Response Costs: The Limits of "Damages" in Comprehensive General Liability Policies*, 16 Ecology L.Q. 755, 797-98 (1989).

was "expected or intended" by the policyholder. Weyerhaeuser argues it had a duty to mitigate damages once property damage had already occurred and the failure to do so could cause it to lose its insurance coverage. Insurers do not refute the fact that the policyholders may have a duty to mitigate damages once they have occurred; in fact, they raise the failure to mitigate damages as an affirmative defense in some of their answers.[28]

The insurers argue, however, that the duty to mitigate is not yet an issue in this case as the only issue raised in their motion for summary judgment is the lack of an adversarial third party making a claim or threat. The insurers argue that before one reaches any issues regarding "mitigation", the first issue is whether there has to be a lawsuit or claim (or threat of such) before liability coverage is triggered. The insurers argue that in the event the "no third party claims" motion is reversed, then the mitigation issues would be litigated on a site-by-site basis in future motions or at trial.

The problem with the insurers' position is that mitigation may need to take place after pollution has occurred but *before* there is any overt threat from a third party. Logically, a duty to mitigate may be crucial to the present issue of whether a policyholder *can* await the threat of legal action before initiating statutorily mandated cleanup efforts. The issue of mitigation costs may generally relate to the amount of recovery and not to the initial issue of determination of coverage. However, in this case they are not mutually exclusive concepts. Certainly, the amount of any recovery is not before this court, but mitigation does have relevance to the present inquiry.

The denial of coverage in this case is not just a statement that the claim is premature and could be asserted at a later time. If Weyerhaeuser cleans up after a government "request" (but before threat of legal action) then the threat of legal

---

[28]Some insurers' answers contain the following affirmative defense: "To the extent Weyerhaeuser failed to mitigate, minimize or avoid damages, any recovery, all of which [the insurer] denies, is reduced by the amount resulting from this failure." Clerk's Papers, at 898, 931, 964. See also Clerk's Papers, at 977.

action (which the insurers argue is what triggers coverage) would never materialize. Hence, there could never be coverage. The following scenario occurs under the insurers' position. If pollution has damaged other property, and an environmental agency has told the landowners they are statutorily responsible to remedy the situation, but has not yet threatened suit, the policyholders have two options: (1) clean up and forgo any possibility of recovering from their liability insurance because of lack of overt threat or (2) refuse to negotiate with the agency and refuse to clean up and wait to be sued or to be threatened with suit. If the second option is taken the policyholder also may not have any insurance coverage (at least for damage that occurred after knowledge) because it has failed to mitigate its damage or because the pollution was expected or intended. Such an anomalous result would undercut our core holding in *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 784 P.2d 507, 87 A.L.R.4th 405 (1990) and result in fundamental unfairness to policyholders who reasonably believed they had insurance coverage for certain kinds of property damage caused by pollution.

Amicus Association of Washington Cities argues that in a case where a city has inadvertently polluted, the trial court order puts them in an especially difficult conflict. Cities and counties traditionally have owned or operated waste disposal sites and have purchased liability policies similar to those involved here. The result of the trial court's order creates a serious conflict between the local governments' duty to act promptly in response to statutory liabilities to protect the public health and environment and the duty to preserve the availability of the liability insurance coverage purchased to financially protect the public. Amicus Association of Washington Cities further argues that under the trial court's ruling, the cities and towns must wait and do nothing about the spread of hazardous contamination in order to insure that their liability insurance will not be voided. They argue that the policy language pending coverage for "liabilities imposed by law" can reasonably be read to encompass reme-

dial actions taken at hazardous sites under environmental statutes that impose liability. We agree.

The insurance contracts provide coverage when the policyholder becomes obligated to pay by reason of the liability "imposed by law". The policy language does not specify whether this liability must be imposed by formal legal action (or threat of such) or by a statute which imposes liability. In the case where there has been property damage[29] and where a policyholder is liable pursuant to an environmental statute, a reasonable reading of the policy language is that coverage is available, if it is not otherwise excluded.

There is nothing in the insurance policy language which requires a "claim" or an overt threat of legal action and, therefore, the insurers' argument that a claim is a prerequisite to coverage seems to us to be an effort to add to the language of the policies. If the insurers intended to provide coverage only if there were a lawsuit or a threat of such, that requirement could have been included in the policy. In this case, the policy language does not require an adversarial claim or a third party threat or a formal threat of legal action. We decline to add language to the words of an insurance contract that are not contained in the parties' agreement.[30]

Additionally, forcing a policyholder to both promptly act to mitigate further environmental damage, *and* to await formal threat of legal action creates an unresolvable conflict and results in destroying the contractual right to liability coverage in many cases involving environmental pollution damages.

The trial court's summary judgment order on the limited issue before us is reversed and the case is remanded for further proceedings. This result allows for the possibility[31] of

---

[29]*Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 886-87, 784 P.2d 507, 87 A.L.R.4th 405 (1990).

[30]*See, e.g., Boeing*, 113 Wn.2d at 881.

[31]We are well aware that many issues remain in this complex case and we have endeavored to be scrupulously careful to decide only the narrow issue presently before us. We are cognizant of the fact that the only policy language before us is the

an ultimate determination of coverage for property damage when a policyholder acts cooperatively with an environmental agency to comply with statutes which impose liability on polluting parties.

UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.

insuring clause of the contracts and that no exclusions to coverage are presently at issue. The insurers on remand may, of course, raise other coverage issues not presently before the court in this still developing case. The excellent briefing and argument by counsel for all parties and amici involved in this case is appreciated by the court.