FILED
4/19/2024
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| C.A. CAREY CORPORATION, a Washington corporation, | No. 84602-7-I |
| Appellant, | DIVISION ONE |
| v. | ORDER GRANTING MOTION TO PUBLISH |
| CITY OF SNOQUALMIE, a Washington municipal corporation, | |
| Respondent. | |

Amicus curiae, Washington State Association of Municipal Attorneys, and non-party, Stoel Rives LLP, each filed a motion to publish on March 12, 2024. A panel of the court called for an answer to the motions on March 21, 2024. Respondent, City of Snoqualmie, filed an answer on April 5, 2024. After review of the motions and answer, a panel of this court has determined that the motions to publish should be granted.

Now, therefore, it is hereby

ORDERED that the motions to publish are granted.

FOR THE COURT:

_____
Hazelrigg, ACJ

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| C.A. CAREY CORPORATION, a Washington corporation,<br><br>     Appellant,<br><br>   v.<br><br>CITY OF SNOQUALMIE, a Washington municipal corporation,<br><br>     Respondent. | No. 84602-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, A.C.J. — C.A. Carey Corporation appeals from the trial court's grant of the City of Snoqualmie's motion for summary judgment dismissal of its claims against the municipality based on a public works contract. Because there is no issue of material fact as to the contractor's lack of compliance with the mandatory notice, protest, and claim provisions of standard specifications expressly incorporated into the contract, its causes of action are barred as a matter of law. We affirm.

FACTS

In February 2014, the City of Snoqualmie advertised construction bids for the public works contract of the "Town Center Infrastructure Improvements Phase 2A Project" (project). The project involved improvements to downtown Snoqualmie, including installation of a new water main, storm drainage system,

undergrounding of power, cable, and phone lines, and roadway paving. Following the public bidding process, the contract was awarded to C.A. Carey Corporation (Carey) on April 28, 2014 as the lowest responsive, responsible bidder. On May 12, 2014, the City and Carey entered into a public works agreement (contract) for the project. Pursuant to the contract, Carey was obligated to "achieve substantial completion of all [w]ork required by the [c]ontract [d]ocuments[1] within 180 working days" for the principal sum of $4,282,653.42.

The contract incorporated the 2012 Washington State Department of Transportation (WSDOT) publication "Standard Specifications for Road, Bridge, and Municipal Construction" (standard specifications). The standard specifications are uniform requirements for public works agreements that provided the general terms of the contract between the City as the contracting agency and the contractor, Carey. Among the requirements are mandatory notice and claim procedures that govern the specific process that must be followed when a contractor seeks additional time or payment on a project.

On May 12, 2017, Carey filed a complaint against the City for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of implied warranty of design. In its breach of contract claim, Carey alleged that the City failed to acknowledge known defects in the project design, failed to pay for the increased costs of construction, and failed to award additional contract time Carey said became necessary due to numerous design changes. On June 26, the

---

[1] The contract provided that "Contract Documents" included, among other things, contract plans and standard specifications, as well as amendments to the standard specifications.

City filed its answer to the complaint and a counterclaim that asserted Carey had breached the contract by "failing to timely and/or properly perform its work."

On September 27, 2019, both parties moved for summary judgment. A hearing on the motions took place on October 25 and the trial court heard argument from counsel for the City and Carey. Carey conceded that all three causes of action in its complaint arose from the contract and thus would rise and fall together. On November 4, the judge entered a written order that granted the City's motion for summary judgment and dismissed each of Carey's claims. The trial court concluded that Carey had waived the right to pursue its claims because it failed to comply with the standard specifications, particularly the mandatory notice, protest, and claim provisions in sections 1-04.5 and 1-09.11 of the standard specifications. Because the requirements of those provisions are "conditions precedent to litigation," the trial court concluded that dismissal of Carey's complaint was required.

On November 13, Carey moved for reconsideration pursuant to CR 59(7) and (9) and requested that the trial court vacate its summary judgment order. The following day, Carey submitted an amended motion for reconsideration. In support of its motion, Carey included additional evidence in the form of numerous exhibits attached to a declaration. On December 3, the judge denied reconsideration. In the written order, the court explained that it did not consider the supplemental exhibits submitted with the motion because Carey offered "no grounds to support consideration of additional evidence" as required by CR 59(a)(4).

Carey timely appealed.

ANALYSIS

I.    Summary Judgment Dismissal

Carey assigns error to the trial court's order granting the City's motion for summary judgment dismissal. According to Carey, the court erred by applying a strict compliance standard to determine whether Carey adhered to the standard specifications, improperly interpreting the claim limitation and final contract voucher certification provisions, and "enforcing strict contractual notice and claim requirements against Carey" when "the City was the first party to breach."

"On appeal of summary judgment, the standard of review is de novo, and the appellate court performs the same inquiry as the trial court." *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). "The court must consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party." *Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.*, 123 Wn.2d 891, 897, 874 P.2d 142 (1994). "A court may grant summary judgment if the pleadings, affidavits, and depositions establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law*." Lybbert*, 141 Wn.2d at 34; *see also* CR 56(c). "A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation." *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). "However, bare assertions that a genuine material issue exists will not defeat a summary judgment motion." *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 93, 993 P.2d 259 (2000).

"The 'touchstone of contract interpretation is the parties' intent.'" *GMAC v. Everett Chevrolet, Inc.*, 179 Wn. App. 126, 134, 317 P.3d 1074 (2014) (internal quotation marks omitted) (quoting *Realm, Inc. v. City of Olympia*, 168 Wn. App. 1, 4-5, 277 P.3d 679 (2012)). "Washington courts follow the objective manifestation theory of contracts, imputing an intention corresponding to the reasonable meaning of the words used." *Realm*, 168 Wn. App. at 5. "Contract interpretation is a question of law when, as here, the interpretation does not depend on the use of extrinsic evidence." *Id.* When the contract is unambiguous, "summary judgment is proper even if the parties dispute the legal effect of a certain provision." *Voorde Poorte v. Evans*, 66 Wn. App. 358, 362, 832 P.2d 105 (1992).

A.     Compliance With Standard Specifications is Mandatory

Carey concedes that the contract expressly incorporated the 2012 edition of the WSDOT "Standard Specifications for Road, Bridge and Municipal Construction." "If the parties to a contract clearly and unequivocally incorporate by reference into their contract some other document, that document becomes part of their contract." *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 801, 225 P.3d 213 (2009). Thus, while acknowledging that the mandatory notice, protest, and claim provisions of the standard specifications are part of this contract, Carey argues that it was not required to strictly comply with those provisions. According to Carey, "Washington courts employ a substantial compliance standard to decide whether the contractor's notices, protests, and claims satisfied the contract's substantive requirements." (Emphasis omitted.) This is incorrect.

Our Supreme Court, "as well as the state appellate courts, has historically upheld the principle that procedural contract requirements must be enforced absent either a waiver by the benefiting party or an agreement between the parties to modify the contract." *Mike M. Johnson, Inc. v. County of Spokane*, 150 Wn.2d 375, 386-87, 78 P.3d 161 (2003); *see also Absher Constr. Co. v. Kent Sch. Dist. No. 415*, 77 Wn. App. 137, 142, 890 P.2d 1071 (1995) ("Washington law requires contractors to follow contractual notice procedures, unless those procedures are waived."). In *Mike M. Johnson*, the court explained that contractors are required to comply with the mandatory protest and claim procedures even when the owner has actual notice of the protest or claim. 150 Wn.2d at 387-88. Due to the contractor's failure to comply with those requirements, the court held that summary judgment dismissal of its contractual claims was proper. *Id.* at 392-93.

The court has reiterated that "absent waiver, failure to comply with contractual procedures bars relief." *American Safety Cas. Ins. Co. v. City of Olympia*, 162 Wn.2d 762, 770, 174 P.3d 54 (2007) (citing *Mike M. Johnson*, 150 Wn.2d at 391). In *American Safety*, the contract incorporated the standard specifications issued in 2000, *Id.* at 764 n.3, and American Safety failed to follow both the notice and claim procedures and brought its cause of action beyond the 180-day time period allowed. *Id.* at 764-65. "Because American Safety admittedly did not comply with the contractual provisions, and because the City [of Olympia] did not unequivocally waive its right to demand compliance with these provisions," the court held that summary judgment in favor of the City of Olympia was appropriate. *Id.* at 771-72. More recently, our Supreme Court referenced *Mike M.*

*Johnson* as a "rule of strict compliance." *NOVA Contracting, Inc. v. City of Olympia*, 191 Wn.2d 854, 867, 426 P.3d 685 (2018). In *NOVA*, which addressed the same 2012 standard specifications at issue here, the court held that the contractor's claim was barred because the contractor failed to "immediately" file the written notice of protest to preserve the claims as required by section 1-04.5. *Id.* at 856, 870-71.

Contrary to Carey's contention in briefing, there was no "substantial compliance" standard applied in either *Weber Construction Inc. v. County of Spokane*, 124 Wn. App. 29, 98 P.3d 60 (2004) or *Realm*, 168 Wn. App. at 1. In *Weber*, the parties contracted to build a road, but after excavation began, Weber discovered several large boulders that were "unsuitable for fill and embankments." 124 Wn. App. at 31. Weber then needed to obtain fill from another site, which increased the costs and delayed the project. *Id.* Weber sought additional compensation and asked Spokane County how to dispose of the large boulders as that information was necessary for Weber in order to provide a cost estimate. *Id.* at 34. Despite Weber's written request, the County failed to provide the information and thus Weber could not provide a cost estimate as required by the protest and claims provisions. *Id.* On review, the court emphasized the following: "The County knew that Weber was required to provide a dollar cost estimate. It knew Weber was aware of this requirement and was attempting to meet it. Weber requested needed information in order to provide that estimate, but the County failed to give it to Weber." *Id.* at 35. Accordingly, the court held that Weber "strictly complied

with protest and claim procedures and that the County, by its conduct, waived strict compliance in any event." *Id.*

In *Realm*, the parties entered into a contract for Realm to build a tunnel for the City of Olympia (Olympia) that would serve as a salmon passage. 168 Wn. App. at 3. After Realm began work on the project, the municipality ordered Realm to stop and terminated the contract. *Id.* Thereafter, Realm submitted a claim for work performed on the project up to the point of termination, but Olympia concluded that it only owed Realm approximately half the amount sought. *Id.* Ultimately, Olympia unilaterally issued the change order and sent Realm a check for the amount it believed was owed as the full and final payment, which Realm cashed. *Id.* Realm then sued Olympia for breach of contract and sought the full amount it had claimed. *Id.* The trial court dismissed Realm's claim on summary judgment and Division Two of this court affirmed. *Id.* In reviewing the standard specifications at issue, this court determined that Realm failed to follow the notice requirements of sections 1-04.5, 1-08.10(3) and (4). *Id.* at 8. Moreover, as section 1-04.5 alone "provides that a contractor accepts all requirements of a change order by failing to protest" and Realm did not protest Olympia's change order setting final payment, the court held that Realm "waived its right to sue under the contract." *Id.* at 9.

Neither *Weber* nor *Realm* even reference a substantial compliance standard for the mandatory notice, protest, and claim provisions, much less establish one through an express holding. Carey points to a section in *Realm* where the court discusses *Weber* and notes that "[i]f Realm had shown *some* good

faith effort to comply with section 1-04.5, we might reach a different result." *Realm*, 168 Wn. App. at 11. *Realm* categorized Weber's failure to provide the cost estimate as required in section 1-04.5 as a "technical failure" and stated that "[h]ad Realm made a similar technically defective attempt to comply with section 1-04.5, we might be persuaded that it provided sufficient evidence of compliance with the contract to escape summary judgment." *Id.* (citing *Weber*, 124 Wn. App. at 34). Such a "technically defective attempt" to comply with section 1-04.5 would require a timely notice of protest with an explicit request for the specific information necessary to provide a component of the written supplement. A passing reference to "sufficient evidence of compliance" does *not* mean substantial compliance and certainly does not change the controlling legal standard; again, *Weber* held that the contractor "*strictly complied* with protest and claim procedures and that the County, by its conduct, waived *strict compliance*." 124 Wn. App. at 35 (emphasis added).

As these cases make clear, contractors must follow the specific requirements of the notice, protest, and claim provisions in order to preserve their contractual claims for litigation. Thus, unless Carey complied with those procedural requirements as provided in the 2012 standard specifications, its claims arising under this contract are waived as a matter of law.

B.   Change Orders

Pursuant to section 1-04.4 of the standard specifications, the City's engineer[2] is allowed to make alterations to the scope of the contractor's work without invalidating the contract.  Among others, these changes include increasing or decreasing the quantity of work, altering specifications and/or designs, changing the way the work is done, adding or removing work, altering facilities, services, or equipment, and requiring the contractor to speed up or delay the work.  WASH. STATE DEP'T OF TRANSP., PUB NO. M 41-10, STANDARD SPECIFICATIONS FOR ROAD, BRIDGE, AND MUNICIPAL CONSTRUCTION § 1-04.4, at 1-20 (2012) (STANDARD SPECIFICATIONS),  wsdot.wa.gov/publications/manuals/fulltext/M41-10/SS2012.pdf [https://perma.cc/77X9-Z593].  When such a change is made, the engineer will issue a "written change order."  If the change is significant, the contract will be adjusted by agreement, and if the parties do not reach an agreement, then the engineer may unilaterally determine the amount of the adjustment, provided that it is "fair and equitable."  A "significant change" applies to circumstances where either "the character of the [w]ork as altered differs materially in kind or nature" from that included in the original contract, or "an item of [w]ork, as defined elsewhere in the [c]ontract, is increased in excess of 125 percent or decreased below 75 percent of the original [c]ontract quantity."  *Id.*

If a change is made to the scope of the work and the parties cannot agree on an equitable adjustment to the contract, the engineer will determine the additional compensation in accordance with section 1-09.4 and the allowed time

---

[2] The engineer is defined in section 1-01 of the standard specifications as the "[c]ontracting [a]gency's representative who administers the construction program for the [c]ontracting [a]gency."

extension pursuant to section 1-08.8. *Id.* Section 1-09.4 provides that equitable adjustments for compensation are determined by either unit prices or "[o]ther means to establish costs" subject to limitations. *Id.,* § 1-09.4, at 1-89. Under section 1-08.8, time extensions are limited to changes or events that "had a specific impact on the critical path" and "could not have been avoided by resequencing of the [w]ork or by using other reasonable alternatives." *Id.,* § 1-08.8, at 1-78.

Here, over the duration of the project, the City issued 16 change orders. The change orders increased the amount of time for Carey to complete the project from 180 days to 242.5 days and provided for additional compensation that raised the contract price from $4,282,653.42 to $4,702,656.86. Carey did not agree with the majority of the adjustments and attempted to protest nine of the change orders.

C.    Protested Change Orders

Section 1-04.5, titled "Procedure and Protest by the Contractor," provides the specific course of action for a contractor to protest change orders. Importantly, section 1-04.5 states:

> A change order that is not protested as provided in this [s]ection shall be full payment and final settlement of all claims for [c]ontract time and for all costs of any kind, including costs of delays, related to any [w]ork either covered or affected by the change. By not protesting as this [s]ection provides, the [c]ontractor also waives any additional entitlement and accepts from the [e]ngineer any written or oral order (including directions, instructions, interpretations, and determinations).

In order to protest the engineer's determination, the contractor must:

1. Immediately give a signed written notice or protest to the [p]roject [e]ngineer or the [p]roject [e]ngineer's field [i]nspectors before doing the [w]ork;
2. Supplement the written protest within 14 calendar days with a written statement and supporting documents providing the following:
   a. The date and nature of the protested order, direction, instruction, interpretation or determination;
   b. A full discussion of the circumstances which caused the protest, including names of persons involved, time, duration and nature of the [w]ork involved, and a review of the [p]lans and [c]ontract [p]rovisions referenced to support the protest;
   c. The estimated dollar cost, if any, of the protested [w]ork and a detailed breakdown showing how that estimate was determined;
   d. An analysis of the progress schedule showing the schedule change or disruption if the [c]ontractor is asserting a schedule change or disruption; and
   e. If the protest is continuing, the information required above shall be supplemented upon request by the [p]roject [e]ngineer until the protest is resolved.

*Id.,* § 1-04.5 at 1-21 to 1-22.

Pursuant to section 1-04.5(1), Carey provided signed written notice of protest to change orders 5, 7, 8, 10, 11, 12, 13, 14, and 15. Carey also provided written supplements to those protests as required by section 1-04.5(2). However, Carey's written supplements did not include all of the substantive information and analysis required by subsections (a)-(e). Some of its written supplements provided an estimated dollar cost but no "detailed breakdown showing how that estimate was determined" as required by 1-04.5(2)(c). Many of them did not provide the mandatory "analysis of the progress schedule showing the schedule change or disruption" called for in 1-04.5(2)(d), but rather broadly stated that "Carey is currently analyzing the schedule impacts from this change and all previous changes [and] due to the massive number of changes and their ongoing nature,

cannot provide specific schedule impacts at this point." Because Carey's protests and supplements did not comply with the substantive requirements of section 1-04.5, the City determined they were invalid and submitted a written explanation to Carey for each one.

### D.    Notice of Claims

Section 1-04.5 explains that if "the [c]ontractor does not accept the [e]ngineer's determination then the [c]ontractor shall pursue the dispute and claims procedures set forth in [s]ection 1-09.11." Further, if the contractor does not follow the procedures of both sections 1-04.5 and 1-09.11, "the [c]ontractor completely waives any claims for protested [w]ork." *Id.,* § 1-04.5, at 1-22. Under section 1-09.11, when the protest under section 1-04.5 does not provide a satisfactory resolution for the contractor, "then the [c]ontractor shall provide the [p]roject [e]ngineer[3] with written notification that the [c]ontractor will continue to pursue the dispute in accordance with the provisions of [s]ection 1-09.11." This notice must be provided within seven days after receipt of the engineer's written determination that the protest was invalid under section 1-04.5. *Id.,* § 1-09.11, at 1-96. The notice shall indicate whether the contractor seeks to resolve the dispute through a "[d]isputes [r]eview [b]oard as outlined in [s]ection 1-09.11(1), or to submit a formal claim directly to the [c]ontracting [a]gency pursuant to [s]ection 1-09.11(2)." *Id.* If there is no request for consideration by a dispute review board or one is not

---

[3] The project engineer is the "[e]ngineer's representative who directly supervises the engineering and administration of a construction project." STANDARD SPECIFICATIONS, *supra,* at 1-5.

established, the contractor "shall submit a formal claim directly to the [c]ontracting [a]gency as outlined in [s]ection 1-09.11(2)." *Id.*

In accordance with section 1-09.11, Carey provided the City with timely written notices of its intent to pursue claims related to each denied change order[4] and indicated that it sought to resolve the issues through the use of a dispute review board. The City responded to each of Carey's notices and stated that Carey did not have any legal or contractual right to pursue such claims. Each response from the City directed Carey to section 1-04.5 of the standard specifications and stated that "Carey's failure to comply with requirements of 1-04.5 has resulted in [] Carey's complete waiver of any such claim for protested work."

### E. Formal Claim Requirements

Section 1-09.11(2) provides that all claims must be in writing and "in sufficient detail to enable the [e]ngineer to ascertain the basis and amount of the claim." The contractor must submit all claims to the project engineer. Section 1-09.11(2) also provides a list of information that must accompany each claim, including a detailed factual statement, specific provisions of the contract that support the claim, and copies of any supporting documents. Claims for additional time must include an analysis of the progress schedule to show the reason for such an extension, and claims for additional compensation must provide "the exact amount sought and a breakdown of that amount" into various subcategories. *Id.,* § 1-09.11(2), at 1-99. "Failure to submit with the [f]inal [c]ontract [v]oucher

---

[4] With the exception of change order 15, as Carey did not file notice of its intent to file a claim within the 7-day window required by section 1-09.11. Carey concedes in briefing that its notice of claim for change order 15 was not timely.

[c]ertification such information and details as described in this [s]ection for any claim shall operate as a waiver of the claims by the [c]ontractor as provided in [s]ection 1-09.9." *Id.,* § 1-09.11(2), at 1-100.

Although Carey provided written notice of intent to submit claims on nine different change orders and ten other issues, the *only* formal claim that it submitted before the final contract voucher certification was its claim on change order 5, which was done on October 28, 2015. In its formal claim, Carey sought an additional 25 days of work due to "changes to the Waterline, Joint Utility Trench, Storm Sewer, Gas Line, and Excavation" and additional compensation in the amount of $139,366.90. On January 27, 2016, the City responded to Carey's claim and denied the request for additional time and compensation. First, the City reiterated that Carey had waived its right to the adjustments by failing to comply with section 1-04.5. It also denied the request for additional time because Carey failed to identify the specific days and dates for which the time was sought, as required by section 1-09.11(2)(8)(a), and further did not provide analysis of its progress schedule as required by section 1-09.11(2)(8)(d). The request for additional compensation was denied because Carey simply estimated its costs rather than using force account worksheet tracking supported by certified payroll data, which the City had used when it issued the change order.

F.    Final Contract Voucher Certification and Payment

Under the standard specifications, once all the work is completed and inspected, section 1-09.9 provides that the amount paid to the contractor is based on the engineer's final estimate and "presentation of a [f]inal [c]ontract [v]oucher

- 15 -

[c]ertification" to be signed by the contractor. This voucher "shall be deemed a release of all claims of the [c]ontractor unless a claim is filed in accordance with the requirements of [s]ection 1-09.11 and is expressly excepted from the [c]ontractor's certification on the [f]inal [c]ontract [v]oucher [c]ertification." *Id.,* § 1-09.9, at 1-94 to 1-95. If the contractor "fails, refuses, or is unable to sign and return the [f]inal [c]ontract [v]oucher [c]ertification or any other documentation required for completion and final acceptance of the [c]ontract," section 1-09.9 explains that "the [c]ontracting [a]gency reserves the right to establish a [c]ompletion [d]ate . . . and unilaterally accept the [c]ontract." Before unilateral acceptance of the contract, the engineer must provide a written request to the contractor to submit the necessary documents. If the contractor does not comply voluntarily, a formal notification of the impending establishment of a completion date and unilateral final acceptance will be provided to the contractor and the City will provide 30 days for the contractor to submit the documents. Pursuant to section 1-09.9, "[t]he date the [s]ecretary[5] unilaterally signs the [f]inal [c]ontract [v]oucher [c]ertification shall constitute the [c]ompletion [d]ate and the final acceptance date."

On July 8, 2016, once the project work was completed, the City provided a final progress estimate and final contract voucher to Carey for review and signature pursuant to section 1-09.9. Carey did not respond and the City sent another letter to Carey on August 8 informing it of the City's intention to establish the completion date and to issue a unilateral final contract voucher. In accordance with section 1-

---

[5] The definitions and terms set out in the 2012 standard specifications incorporated into the contract at issue here explain that "Secretary" refers to the "Secretary of Transportation;" "the chief executive officer of the Department [of Transportation] or other authorized representative." STANDARD SPECIFICATIONS, *supra,* § 1-01, at 1-5.

09.9, the City provided Carey with 30 days to comply and submit the necessary documents. On August 18, Carey responded and expressly refused to sign the final contract voucher. Carey requested renegotiation on unit prices of numerous bid items, stated that it had outstanding claims on multiple change orders, and disputed the quantities paid on various bid items. Roughly one month later, September 14, Carey wrote another letter to the City and reiterated that it would not sign the voucher for those reasons. On October 14, the City wrote to Carey and explained that it was proceeding with unilateral closeout of the project pursuant to section 1-09.9 as "Carey did not submit any additional or outstanding claims" during the 30-day period that was provided. On October 21, the City issued the final progress estimate, and on November 2, the final contract payment was sent to Carey. Thereafter, on November 14, the Snoqualmie City Council adopted a resolution that accepted the project as complete and authorized the issuance of a unilateral final contract voucher certificate, which was executed that day. Thus, under section 1-09.9, the completion and final acceptance date was November 14.

G.      Omnibus Claim

Approximately six months later, on May 12, 2017, Carey sent the City an "omnibus claim" that purported to comply with section 1-09.11(2).[6] Carey's omnibus claim sought $1,796,756 and an additional 163 days of work. The City

---

[6] Carey filed its complaint against the City the same day. However, the very section of the standard specifications Carey cites in support of its contention that the claim was timely expressly directs that "any such claims or causes of actions shall be brought *only in the Superior Court of Thurston County*." (Emphasis added.) While not addressed by either party in briefing, it is noteworthy that, in addition to the defect based on timeliness, Carey filed its cause of action against the City in King County Superior Court, not in Thurston County.

denied the claim for numerous reasons, asserting that it was untimely under section 1-09.11(2), waived under section 1-09.9, and barred by Carey's failure to comply with notice and protest requirements of section 1-04.5.

On appeal, Carey insists that the omnibus claim was timely pursuant to section 1-09.11(3), "Time Limitation and Jurisdiction." That section provides as follows:

> For the convenience of the parties to the [c]ontract it is mutually agreed by the parties that any claims or causes of action which the [c]ontractor has against the State of Washington arising from the [c]ontract shall be brought within 180 calendar days from the date of final acceptance ([s]ection 1-05.12) of the [c]ontract by the State of Washington; and it is further agreed that *any such claims or causes of action shall be brought only in the Superior Court of Thurston County. The parties understand and agree that the [c]ontractor's failure to bring suit within the time period provided, shall be a complete bar to any such claims or causes of action*. It is further mutually agreed by the parties that when any claims or causes of action which the [c]ontractor asserts against the State of Washington arising from the [c]ontract are filed with the State or initiated in court, the [c]ontractor shall permit the State to have timely access to any records deemed necessary by the State to assist in evaluating the claims or action.

(Emphasis added.) According to Carey, because it submitted the omnibus claim on May 12, 2017, 179 days after the final acceptance date of November 14, 2016, it was timely.

Absent clear intent to the contrary, we "give words in a contract their ordinary, usual, and popular meaning." *Hearst Commc'ns, Inc. v. Seattle Times Co.,* 154 Wn.2d 493, 504, 115 P.3d 262 (2005). We also "view the contract as a whole, interpreting particular language in the context of other contract provisions." *City of Union Gap v. Printing Press Props., LLC,* 2 Wn. App. 2d 201, 224-25, 409 P.3d 239 (2018). Here, a plain reading of section 1-09.11(3) shows that it concerns

litigation claims, not administrative ones. This is clear from the requirement that any such claims and causes of action "shall be brought *only* in the Superior Court of Thurston County." STANDARD SPECIFICATIONS, *supra,* § 1-09.11(3) (emphasis added).

Interpreting section 1-09.11(3) as inapplicable to administrative claims is also consistent with section 1-09.11(2), which provides that formal claims must be submitted with the final contract voucher and the failure to do so "shall operate as a waiver of the claims by the [c]ontractor as provided in [s]ection 1-09.9." Here, Carey's omnibus claim is barred by the plain language of section 1-09.11(2). Because section 1-09.11(2) required Carey to submit its omnibus claim "*with* the [f]inal [c]ontract [v]oucher [c]ertification" and Carey did not submit it until 179 days after the issuance of the unilaterally signed final contract voucher certification, the claim was waived. (Emphasis added.) The importance of diligent compliance with the notice, protest, and claim provisions during the contract and the submission of claims prior to final completion or termination of the contract was also highlighted by Division Two of this court in *Realm*:

> All contracting agencies using the [s]tandard [s]pecifications would be denied the benefit of advance notice and the *opportunity to resolve disputes before they devolve into litigation* because contractors could simply choose to litigate their disputes after termination without providing notice of disputes during the work. This is not the result the contract's plain words command.

168 Wn. App. at 11 (emphasis added). Not only was Carey's omnibus claim untimely, it was submitted on the same day that Carey filed its lawsuit against the City, which left no opportunity for resolution prior to litigation. While we have endeavored to clearly illustrate the other procedural lapses throughout this

contractual relationship that establish the trial court did not err when it dismissed Carey's claims as barred as a matter of law, the failure to timely file the omnibus claim is independently fatal to Carey's appeal.

H.    Claim Based on Change Order 5

As noted, the only claim that Carey timely submitted was to change order 5. Carey maintains that this claim was compliant with the standard specifications, but the record shows otherwise. First, the claim is barred under section 1-09.9, which provides that the issuance of the signed final contract voucher certification operated as "a release of all claims of the [c]ontractor unless a claim is filed in accordance with the requirements of [s]ection 1-09.11 and is expressly excepted from the [c]ontractor's certification on the [f]inal [c]ontract [v]oucher [c]ertification." Because the claim was not expressly excepted from the final voucher, it was released pursuant to section 1-09.9. While Carey insists that this release only applies to vouchers that are signed by the contractor, we disagree. But even assuming arguendo that Carey's interpretation was reasonable, the claim was also waived on the independent basis that Carey failed to comply with section 1-04.5.

Prior to the issuance of the unilaterally signed final contract voucher, Carey waived its claim to change order 5 by failing to follow the notice and protest provisions of section 1-04.5. Although Carey provided notice of its intent to protest change order 5, Carey failed to provide the necessary information required in its written supplement pursuant to section 1-04.5(2). Carey was obligated under the plain terms of the standard specifications to provide a cost estimate of the protested work "and a detailed breakdown showing how that estimate was

- 20 -

determined." STANDARD SPECIFICATIONS, *supra,* § 1-04.5(2)(c), at 1-21 to 1-22. Carey simply wrote, "Estimated value is $100,000." Additionally, Carey was required to provide an "analysis of the progress schedule showing the schedule change or disruption." *Id.,* § 1-04.5(2)(d), at 1-21 to 1-22. Carey offered no such analysis; instead, it wrote that it was "currently analyzing the schedule impacts" and "cannot provide schedule impacts at this point." Section 1-04.5 is clear: "A change order that is not protested as provided in this [s]ection shall be full payment and final settlement of all claims for [c]ontract time and for all costs of any kind."

Without reference to the record, Carey claims that "the City made it impossible for Carey to comply with the contract's substantive protest and claim requirements due to the manner in which the City 'sliced and diced' Carey's [change order proposals] and repackaged its requested costs into unilateral change orders." "Appellate courts need not consider arguments that are unsupported by pertinent authority, references to the record, or meaningful analysis." *Cook v. Brateng*, 158 Wn. App. 777, 794, 262 P.3d 1228 (2010). Because Carey's assertion on this point is wholly unsupported, we decline to consider it.

In a brief of amici curiae filed by the Associated General Contractors of Washington and National Utility Contractors Association of Washington in support of Carey, amici propose a rule of substantial compliance that is based on impossibility. Their proffered rule is as follows: "when a contractor substantially complies with the contract's requirements, in a good faith effort to strictly comply, and under the circumstances strict compliance was not possible, its claim may

potentially survive summary judgment."[7]   While it is conceivable that circumstances could arise where there is no waiver yet strict compliance is rendered impossible, the record before us does not present any impossibility of compliance and thus we have no reason to consider the merits of such a rule here. Binding precedent from our Supreme Court holds that strict compliance with these procedures is mandatory absent waiver.  *See Mike M. Johnson*, 150 Wn.2d at 387-88; *American Safety*, 162 Wn.2d at 762; *NOVA*, 191 Wn.2d at 867.  Additionally, this court has explained that when the contracting agency prevents the contractor from strictly complying with the provisions, e.g., the City fails to provide the contractor with the information required in order to do so, then strict compliance is waived.  *Weber*, 124 Wn. App. at 34-35.  Carey does not argue that the City waived strict compliance and has no support for its off-handed impossibility claim, which makes sense in light of Carey's insistence that "it did, in fact, strictly comply with the [c]ontract's notice, protest and claim, provisions."

Carey then contends that the City was barred from enforcing the notice and claim provisions because, according to Carey, "[t]he City breached the implied warranty of design by issuing defective plans and specifications."  Carey relies on *Kenco Construction Inc. v. Porter Bros. Construction Inc.,* a distinguishable and unpublished case.  No. 74069-5-I, slip op. (Wash. Ct. App. June 11, 2018) (unpublished) https://www.courts.wa.gov/opinions/pdf/740695.pdf.[8]  In *Kenco*, the

---

[7] In the amicus brief submitted in support of the City, the Washington State Association of Municipal Attorneys (WSAMA) urges this court to reject the "substantial compliance" rule proposed by Carey.  WSAMA notes, correctly, that this court "is not in a position to overturn decades of legal precedent to impose a 'substantial compliance' rule."

[8] As this case is unpublished, it is analyzed here only because it is relied upon in briefing. *See* GR 14.1.

parties entered into a subcontract, which the general contractor breached when it withheld payments to the subcontractor for work that had already been completed and for which payment was required under the terms of the subcontract. Slip op. at 7. The general contractor argued that the subcontractor had waived its claims as it had failed to strictly comply with the notice provisions under the contract. *Id.* at 14. On review, this court explained that "[a] party is barred from enforcing a contract that it has materially breached," and thus, "[i]f the jury found that [the general contractor] was first to materially breach the contract, [the general contractor] would have no authority to enforce compliance to the contract's strict notice requirements." *Id* at 14-15*.*

Unlike the general contractor in *Kenco,* which withheld payment that was due under the terms of the subcontract, the City paid Carey for all of its work in accordance with the contractual provisions. The standard specifications expressly allow the City to alter the scope of Carey's work without invalidating the contract. STANDARD SPECIFICATIONS, *supra,* § 1-04.4, at 1-20. Consistent with the terms of the contract, the City issued change orders and made equitable adjustments in accordance with sections 1-08.8 and 1-09.4. Because the work under the project changed, the City awarded Carey additional compensation and time. As Carey points to no material breach of the contract, *Kenco* is inapposite and Carey's "first breach" argument is unavailing.

Viewing the evidence and drawing all reasonable inferences in favor of Carey as the nonmoving party, Carey has failed to establish any genuine issue of material fact as to whether it complied with the mandatory notice, protest, and

claim provisions of the standard specifications. While Carey insists that a genuine material issue exists, bare assertions are insufficient to defeat summary judgment. *Trimble*, 140 Wn.2d at 93. Further, Carey's interpretation of section 1-09.11(3) as allowing administrative claims to be submitted up to 180 days after final completion of the project is at odds with the plain language of the provision, which is unambiguous. Thus, even though Carey disputes the effect of that provision, summary judgment is not precluded. *See Voorde Poorte*, 66 Wn. App. at 362. Because Carey does not demonstrate any genuine issue of material fact as to whether it complied with the mandatory procedures in order to preserve its claims under the contract, the trial court did not err in granting summary judgment in favor of the City.[9]

II.    Award of Attorney Fees and Costs To the City by the Trial Court

Carey provides no argument on this issue beyond its assignment of error which reads: "Because the trial court erred in dismissing Carey's claims on summary judgment, the trial court also erred in awarding attorneys' fees and costs to the City." As explained, the trial court did not err in granting summary judgment. The trial court awarded the City attorney fees and costs pursuant to RCW

---

[9] Carey also assigns error to the trial court's denial of its motion for reconsideration and its refusal to consider additional evidence submitted in support of that motion. Because the trial court did not err in granting summary judgment, it was not error to deny Carey's motion for reconsideration.

Further, the trial court did not err in refusing to consider Carey's additional evidence. Under CR 59(a)(4), a motion for reconsideration may be granted on "[n]ewly discovered evidence, material for the party making the application, which the party could not with reasonable diligence have discovered and produced at [summary judgment]." "If the evidence was available but not offered until after that opportunity passes, the parties are not entitled to another opportunity to submit that evidence." *Wagner Dev., Inc. v. Fid. & Deposit Co. of Md.*, 95 Wn. App. 896, 907, 977 P.2d 639 (1999). As the trial court noted, Carey offered no explanation for the new evidence and did not even contend that it was unavailable beforehand. Accordingly, the trial court did not err in refusing to consider it.

39.04.240, which entitles the City to such recovery when it prevails on an action arising out of a public works contract. Because the City prevailed in such a dispute, the trial court did not err in awarding attorney fees and costs to the City.

III.     Attorney Fees and Costs To the City on Appeal

The City seeks attorney fees and costs on appeal pursuant to RCW 39.04.240 and RAP 18.1(b). RCW 39.04.240 allows for such an award, and the City has both complied with RAP 18.1(b) by devoting a section of its brief to its request and prevailed in this appeal. Accordingly, we award the City reasonable attorney fees and costs incurred on appeal, subject to compliance with the additional procedural requirements set out in RAP 18.1.

Affirmed.

_____

WE CONCUR:

_____    _____